Walter B. COX, Plaintiff,

v.

GUY F. ATKINSON COMPANY, a
corporation, Defendant.

Civ. No. 76–301.

United States District Court,
N. D. Indiana,
Hammond Division.

March 30, 1979.

Bernard M. Tetek, Gary, Ind., William G. Conover, Conover, Claudon & Chew, Valparaiso, Ind., for plaintiff.

Frederick H. Link and David C. Jensen, Hammond, Ind., Stuart S. Ball, H. Blair White, Thomas F. Ryan, Sidley & Austin, Chicago, Ill., for defendant.

## MEMORANDUM DECISION

McNAGNY, District Judge.

### I. Jurisdiction.

This action was initiated on September 27, 1976 in the Circuit Court of Porter County, Indiana. It is with this Court as a result of defendant's Petition for Removal, filed October 21, 1976, in which defendant availed itself of 28 U.S.C. § 1441, stating in support thereof that this "is a civil action wherein the matter in controversy exceeds the sum or value of $10,000 . . . and is between citizens of different states." Plaintiff did not contest removal. It thus appears that the Court's 28 U.S.C. § 1332 jurisdiction is here invoked.

### II. Background.

Plaintiff Walter B. Cox ("Cox") was employed by Walsh Construction Company ("Walsh"), a heavy construction firm, from May of 1963 until June 12, 1972, at which

time the complaint alleges Cox was discharged "without good cause." Walsh has been a subsidiary or operating division of defendant Guy F. Atkinson Company ("Atkinson") since 1966.

Cox was employed by Walsh while Walsh was the general contractor for the construction of a "fully integrated" steel mill at Burns Harbor, Porter County, Indiana for Bethlehem Steel Corporation ("Burns Harbor Project"). Cox began his employment with Walsh as a mechanic. In November of 1963, Cox became the master mechanic at the Burns Harbor Project, i. e., the person in charge of all mechanics and heavy equipment operators employed by Walsh through Local 150 of the International Union of Operating Engineers ("Union"). Plaintiff was a member of the Union during the term of his employment with Walsh, apparently retaining membership to this day.

The complaint alleges that during plaintiff's tenure, it was Walsh policy and practice to perform gratuitous personal services for the supervisory project personnel of those companies for which facilities were to be, or were being, erected. This policy and practice was referred to internally as "government jobs."[1] The complaint states:

"In furtherance of this policy, Walsh acting through its chairman of the board of directors and other officers ordered its employees at the Burns Harbor project to implement that policy by performing gratuitous personal services requested by Bethlehem supervisory construction personnel and providing such other services necessary to promote project harmony."

Cox alleges that in 1966 he was ordered by "his superiors" to participate in the implementation of this "policy" at the Burns Harbor Project. He claims to have initially refused the proposition, but submitted to the order when he was told that failure to comply would result in termination, an eventuality Cox could not financially afford. The complaint further states:

"Plaintiff was then given money by Tom Walsh, Jr., chairman of the board of directors of Walsh, and disbursed such money to Bethlehem supervisory construction personnel, and other interested persons, in accordance with the directions of his superiors at the Burns Harbor project, including Thomas J. Murphy, Jr., Walsh project manager, Elmer R. Haney, assistant project manager, and William H. Weaver, general constructions superintendent."

---

1. Thomas J. Murphy, project manager for Walsh at the Burns Harbor project in sworn testimony before the U.S. District Court, South Bend Division, in the case of *United States of America vs. Daniel E. O'Dell*, being No. 74 SCr 48 in that Court, as a witness for the government, defined the term "government jobs" as follows:

"Q. All right. Would you define for us, please, what "Government Jobs" were, as that term was used on that project?
A. "Government Jobs" to me would mean—and what I think it meant to most people that were associated with the project—would mean work that was performed for individuals or for groups of individuals who themselves did not reimburse us directly for performing that work. For example, an individual patio addition which we might have been called upon by the individual to do—to add—this would be a "Government Job", the payment of which would be coded on the tickets which I had reference to. The individual would not reimburse us directly. We, in turn, would submit this in some form, under some other guise, these tickets for payment

in this—in this case by the Bethlehem Steel Corporation.
Q. All right. Can you give us some examples of "Government Jobs"? What were some of the things that people got?
 * * * * * *
Q. The question is: Would you please give us some examples of the types of things that people got under the category of "Government Jobs"?
A. The gamut ranged from a simple innocent bottle of liquor to additions to homes, air travel, expense paid for, credit card use—use of credit cards not belonging to the individuals—that type of thing.
Q. Automobiles?
A. Yes. Automobiles.
Q. All right. New homes in some cases?
A. Yes. New homes in some cases.
Q. Now when—well, these things were paid for as you have described—that is, by false ticket billing and submission of the ticket to Bethlehem Steel—is that correct?
A. On "Government Jobs" that you refer to, yes, they were."
 * * * * * *

In 1972, the Internal Revenue Service notified Atkinson that an investigation was being conducted of certain unnamed Walsh employees working at the Burns Harbor Project. Subsequent to this notification, Cox was discharged. The complaint maintains that Cox was discharged because Atkinson, alerted to the IRS investigation, "sought to protect its own interests by denying any knowledge [of the 'government jobs'] and offering the plaintiff as one of its 'scapegoats.'" [2]

The complaint further states:

"That by reason of plaintiff following his superiors' orders, plaintiff has suffered a loss of wages by virtue of his discharge, he has incurred expense in defending himself against both civil actions brought by the Internal Revenue Service and criminal actions brought by the Department of Justice, that he has been further forced to defend himself in other litigation as well, that he has been compelled to devote substantial amounts of his own time appearing in various administrative and court hearings, and suffered the indignity of serving jail time."

Plaintiff prays judgment for compensatory and exemplary damages in the sum of Six Million Dollars.

### III. Discussion.

On August 11, 1977, defendant tendered a Motion for Summary Judgment, stating as grounds that: (1) plaintiff's claims for breach of his employment contract must be dismissed because of plaintiff's failure to exhaust the grievance-arbitration procedure in an applicable collective bargaining agreement; (2) plaintiff's claims for breach of his employment contract must be dismissed because he was discharged for cause. Additionally, defendant's Motion states that: (1) plaintiff's claim for damages must be dismissed insofar as it pertains to his having committed tax evasion; (2) plaintiff's claim for exemplary damages must be dismissed.

### A. Exhaustion.

It is clear from the complaint and from plaintiff's deposition testimony that plaintiff has endeavored to state a claim for wrongful discharge. It is equally undisputed that, as an employee of Walsh and as a member of Local No. 150 of the International Union of Operating Engineers, plaintiff's wages, hours, and terms and conditions of employment were governed by the collective bargaining agreement in effect between Walsh and the Union. Article IV, Section 22 of this agreement provided that employees covered by the agreement "may be discharged for cause." Article X of the agreement sets forth a grievance-arbitration procedure,[3] to be followed "[w]henever any difference or dispute shall arise as to interpretation or application of the terms of this [a]greement."

---

**2.** Atkinson not only discharged Cox but also dismissed three of his superiors, one of whom was the son of the president of the Walsh division.

**3.** Article X of the collective bargaining agreement provided:

(A) GRIEVANCES AND ARBITRATION— Whenever any difference or dispute shall arise as to interpretation or application of the terms of this Agreement, such dispute or difference shall be resolved in the following order:

(1) In conference between the business agent and the designated representative of the Employer.

(2) In the event the dispute cannot be so resolved within twenty-four (24) hours, it shall then be referred to conference between the designated officers of the Union and the Association.

(3) Unless so resolved within forty-eight (48) hours, the matter shall then be submitted to a Board of five (5) arbitrators, who shall commence the Arbitration talks within forty-eight (48) hours after they have received notice of complaint. Two (2) to be selected by the Union, two (2) to be selected by the Association, and the fifth to be chosen by the four (4) so selected. Upon failure to so select a fifth arbitrator within forty-eight (48) hours, the selection shall then be made in accordance with the rules and procedures of the American Arbitration Association.

(B) HEARING—The Board of Arbitration so selected shall hear all evidence and render its decision by a majority vote based on evidence and the contract.

(C) DECISION—The decision so rendered shall be final and binding upon both the Union and the Employer.

Defendant argues that this Court lacks jurisdiction over this action because of plaintiff's failure to exhaust this grievance-arbitration procedure. Cox did utilize the procedure to a limited extent. Shortly after discharge, Cox spoke with various Union officials. His initial complaint was that Walsh had not given him a statement of the reasons for his discharge. On or about July 7, 1972, he met with Darcey Best, a Union business agent, and filed a written grievance, requesting "a detailed statement of charges and specifications against him." As provided in the first step of the collective bargaining agreement, Best investigated plaintiff's grievance and spoke with a representative of Walsh. Best returned from the meeting with a paper setting forth a reason for plaintiff's termination. Cox never requested that a grievance be processed into the remaining grievance procedure steps, and did not attempt to have the dispute submitted to arbitration.

Defendant supports his first argument by reference to *Vaca v. Sipes,* 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967), in which the Supreme Court stated:

"[I]f the wrongfully discharged employee himself resorts to the court before the grievance procedure has been fully exhausted, the employer may well defend on the ground that the exclusive remedies provided by such a contract have not been exhausted. Since the employee's claim is based upon breach of the collective bargaining agreement, he is bound by terms of that agreement which govern the manner in which contractual rights may be enforced." *Id.* at 184, 87 S.Ct. at 914.[4]

See also, e. g.: *Baldini v. Local U. No. 1095, Intern. U., Etc.,* 581 F.2d 145 (7th Cir. 1978); *Papadopoulas v. Sheraton Park Hotel,* 410 F.Supp. 217 (D.D.C.1976); *American Postal Workers Union v. United States Postal Service,* 396 F.Supp. 608 (N.D.Tex. 1975).

Plaintiff responds by pointing to yet another provision of the agreement, Article XII, asserting this relieves him of the "exhaustion" requirement:

"No employee covered by this Agreement shall be required to exhaust the remedies provided in this Article as a condition precedent to the commencement by him of a civil or other action for wages or money claimed due the employee from the Employer."

It seems unlikely that this clause contemplates the relief plaintiff seeks to derive from it.

■ Doubts as to the applicability of grievance-arbitration procedures are to be resolved in favor of coverage. *See, e. g., United Steelworkers of America v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 582–583, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *Republic Steel Corp. v. Maddox,* 379 U.S. 650, 659, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965); *Local 804, International Brotherhood of Teamsters v. United Parcel Service, Inc.,* 86 LRRM 2294, 2295 (S.D.N.Y.1974); *Local No. 1434, I. B. E. W. v. E. I. duPont de Nemours & Co.,* 350 F.Supp. 462, 466 (E.D.Va.1972); *Air Line Pilots Assn. International v. Capitol Airways, Inc.,* 64 LRRM 2569, 2571 (M.D.Tenn.1966).

■ Here the grievance-arbitration clause is quite broad: "[A]ny difference or

4. The *Vaca* doctrine implements the national labor law policy recognized in the Steelworkers Trilogy decisions:

Arbitration is a stabilizing influence only as it serves as a vehicle for handling any and all disputes that arise under the agreement. . . . The function of the court is very limited when the parties have agreed to submit all questions of contract interpretation to the arbitrator. It is confined to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract. Whether the moving party is right or wrong is a question of contract inter-

pretation for the arbitrator. In these circumstances the moving party should not be deprived of the arbitrator's judgment, when it was his judgment and all it connotes that was bargained for.

The courts, therefore, have no business weighing the merits of the grievance, considering whether there is equity in a particular claim, or determining whether there is particular language in the written instrument which will support the claim. *United Steelworkers of America v. American Manufacturing Co.,* 363 U.S. 564, 568, 80 S.Ct. 1343, 1346, 4 L.Ed.2d 1405 (1960).

dispute [that] shall arise as to interpretation or application of the terms of this Agreement . . . shall be resolved [by the grievance-arbitration procedure]." Excluded from required exhaustion are suits "for wages or money claimed due the employee from the [e]mployer." As the Second Circuit observed in *ITT World Communications, Inc. v. Communications Workers*, 422 F.2d 77, 82 (2nd Cir. 1970): "The combination of a broad arbitration clause and vague . . . exclusionary language has usually . . . led to arbitration."

But no genuine ambiguity surfaces here. It seems clear that this exclusionary language was intended to exempt from the exhaustion requirement situations where an employee believed his employer owned him wages for work he had performed. The purpose of the exclusion surely was to permit a quick resolution, by circumventing the three-step formal grievance procedure, for disputes concerning paycheck errors arising from arithmetical mistakes, disputes over the number of hours the employee had actually worked, or disputes over employer withholding. Such claims of underpayment may be investigated by the Indiana Commissioner of Labor. In a proper case, the Commissioner may take an assignment of the wage claim and proceed to collect the sums via judicial proceedings. I.C. § 22-2-9-1 through I.C. § 22-2-9-7. Such claims do not require the particular expertise of an arbitrator. By excluding them, the parties to the agreement avoided undermining Indiana's statutory scheme for expeditiously resolving wage claims.

Plaintiff's complaint does not ask for "wages or money due" for work performed. And, surely, the mere fact damages are requested does not bring plaintiff under the exemption. If it did, the exemption would swallow the rule because virtually every employee grievance, stretching from those based on employer disciplinary actions, to seniority and job assignment questions, to subcontracting and jurisdictional disputes, is brought because the employer's actions have affected the employee in an adverse economic manner. To the extent that the employer has already implemented the disputed action, the grievant invariably will seek not only a reversal of the action but also attendant back pay.

But this is not the end of the story. Certain exceptions to the exhaustion rule must be considered.

■ An employee can avoid exhaustion where the union has breached its statutory duty of fair representation or where the conduct of the employer amounts to a repudiation of the contractual procedures. *See, e. g., Vaca v. Sipes*, 386 U.S. 171, 185–6, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967); *Fountain v. Safeway Stores, Inc.*, 555 F.2d 753 (9th Cir. 1977); *Harrison v. Chrysler Corp.*, 558 F.2d 1273 (7th Cir. 1977); *Rabalais v. Dresser Industries, Inc.*, 566 F.2d 518 (5th Cir. 1978). No adequate showing has been made on this record to indicate that these exceptions might apply.

■ There is, however, yet another exception that occurs to the Court *sua sponte*. Futility excuses exhaustion. *See, e. g., Southern Pacific Co. v. Brotherhood of Locomotive Firemen and Enginemen*, 129 U.S. App. D.C. 236, 393 F.2d 345 (1967); *Stumo v. United Air Lines, Inc.*, 382 F.2d 780 (7th Cir. 1967); *Jones v. Trans World Airlines, Inc.*, 495 F.2d 790 (2nd Cir. 1974); *Glover v. St. Louis-San Francisco Ry. Co.*, 393 U.S. 324, 89 S.Ct. 548, 21 L.Ed.2d 519 (1969); *Eddings v. Commonwealth of Pennsylvania*, 311 F.Supp. 944 (E.D.Pa.1970); *Winter v. Local Union No. 639, etc.*, 569 F.2d 146 (D.D.C.1977); *Fulton Lodge No. 2, IAM v. Nix*, 415 F.2d 212 (5th Cir. 1969); *Calagaz v. Calhoon*, 309 F.2d 248 (5th Cir. 1962).

■ In a more typical case, it would be incumbent upon the Court to make a definitive determination as regards the arbitrability of plaintiff's claim. *Orphan v. Furnco Const. Corp.*, 466 F.2d 795 (7th Cir. 1972); *Harrison v. Chrysler Corp.*, 558 F.2d 1273 (7th Cir. 1977). But here the applicability of the futility doctrine seems to obviate the need to tarry along those lines. Instead, the same ends will be pursued by an examination of futility as it relates to the record before the Court.

Plaintiff portrays his tenure with Walsh as an experience in an environment of corruption. Defendant does not stress this dark side of the Walsh organization, but it is hardly disputed. It can be learned from portions of the record contributed by defendant that a multitude of criminal actions arose from Walsh's Burns Harbor Project,[5] some involving high ranking Walsh officials, such as Thomas J. Murphy, project manager at the Burns Harbor Project and son of John J. Murphy, president of Walsh. In reference to the Burns Harbor Project "government jobs", Senior Judge Grant of this District, who presided over these criminal actions, expressed the view that it was a "payoff scheme that staggers the imagination . . . ."

There is not adequate support for plaintiff's allegation that "[t]he orders which put the Walsh 'government jobs' policy into effect and kept it in operation . . . came directly from the Walsh board room and from Walsh's chief executive officers." Likewise, plaintiff has not adequately demonstrated that defendant "had actual and constructive knowledge of the . . . scheme, its operation . . . and its production of illegal profits and payments to Walsh."

Nonetheless, viewing the inferences in the light most favorable to plaintiff, as must be done, *Fitzsimmons v. Best,* 528 F.2d 692 (7th Cir. 1976), the Court must find the "government jobs" policy and practice had, indeed, substantially infected Walsh management.[6] In this light, following the grievance-arbitration procedure would certainly take on an air of futility.

■ Plaintiff argues his heart wasn't in the "government jobs." He presents himself as an unwilling participant, doing "only those things he had been ordered or authorized to do, and no more." Defendant urges Cox was obliged to sit across the table with Walsh representatives and engage in the conciliatory efforts contemplated in the collective bargaining agreement. As will become apparent, *infra,* the topic of discussion would be Cox's participation in the "government jobs." Cox would argue that his discharge was without cause in that his role was directed by his superiors. A management that was itself infected by the "government jobs" could hardly accept plaintiff's position. Obviously, to do so would work their own detriment. They would have to, in effect, concede criminal liability. Plaintiff would have inevitably ended up where he more appropriately chose to begin, by resort to the judicial process.[7]

5. *U. S. v. Murphy,* No. SCr 74–115, United States District Court for the Northern District of Indiana, South Bend Division; *U. S. v. Piper,* No. SCr 75–23, United States District Court for the Northern District of Indiana, South Bend Division; *U. S. v. O'Dell,* No. 74 SCr 48, United States District Court for the Northern District of Indiana, South Bend Division.

6. The question of whether Atkinson, as a parent corporation, could be held liable to plaintiff for the alleged acts of Walsh, its subsidiary or operating division, has not been addressed by the parties. It is an important consideration that should be addressed, especially since the actions of Walsh are said to have taken on criminal proportions. *See, e. g., Steven v. Roscoe Turner Aeronautical Corp.,* 324 F.2d 157 (7th Cir. 1963).

7. Section 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185(a), allows suits for violations of collective bargaining agreements. Because of the exhaustion rule, however, civil actions by an employee who has sidestepped the grievance machinery must be dismissed by

a district court. *Republic Steel Corp. v. Maddox,* 379 U.S. 650, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965). Judicial restraint is implicitly contemplated by congressional policy deeming "[f]inal adjustment by a method agreed upon by the parties . . . the desirable method for settlement of grievance disputes . . .," 29 U.S.C. § 173(d), and the policy recognition that:

> The labor arbitrator's source of law is not confined to the express provisions of the contract, as the industrial common law—the practices of the industry and the shop—is equally a part of the collective bargaining agreement although not expressed in it. The labor arbitrator is usually chosen because of the parties' confidence in his knowledge of the common law of the shop and their trust in his personal judgment to bring to bear considerations which are not expressed in the contract as criteria for judgment. The parties expect that his judgment of a particular grievance will reflect not only what the contract says but, insofar as the collective bargaining agreement permits, such factors as the effect upon productivity of a particular

Accordingly, defendant's Motion for Summary Judgment must fail as regards the argument that plaintiff's claim for breach of his employment contract must be dismissed because of plaintiff's failure to exhaust the grievance-arbitration procedure in the collective bargaining agreement.

## B. Good Cause.

Defendant's next argument in support of its Motion for Summary Judgment is that Cox was discharged "for cause." It is generally alleged that Cox was part of a conspiracy to massively defraud defendant, Walsh, and the Bethlehem Steel Corporation. Defendant has compiled a list of acts that, it is argued, justified plaintiff's discharge. Plaintiff does not genuinely dispute the fact that he did commit the acts.

To begin with, Cox is said to have committed criminal acts on the job site, namely, carrying a concealed weapon and gambling with subordinates. Cox is also said to have committed theft during the term of his employment. He stole the records of a Walsh vendor, Dunes Truck Service, after its owner, James Freedman, was killed in an airplane crash. Cox buried the records on a farm to prevent anyone else from seeing them and uncovering the "government jobs."

Cox is said to have engaged in gross misconduct because, after making a bet that he could do it, he shot the ball off the top of a flag pole at the Burns Harbor Project job site. Plaintiff is also said to have received substantial gratuities from a subcontractor, Eibel Plumbing Company. It gratuitously installed a central air conditioning system and a furnace in a house plaintiff owned.

Cox also used for his personal benefit goods and services which were paid for by Walsh. Plaintiff had some work done in the basement of his home at company expense. A Walsh laborer regularly washed and waxed Cox's airplane and some of his personal cars while on the company payroll. Plaintiff received furniture for his house, worth $6,500.00, paid for by Walsh. He obtained a washing machine at company expense. Walsh paid for a pick-up truck which the plaintiff owned. Plaintiff obtained a Coronet automobile at company expense. Walsh paid for gasoline which plaintiff bought at Steele's Gulf Service. He "maybe" received a refrigerator and a color television set paid for by Walsh.

Cox is also said to have embezzled "small amounts" of money from Walsh and to have mingled personal funds with several hundred thousand dollars Walsh entrusted

result, its consequence to the morale of the shop, his judgment whether tensions will be heightened or diminished. *United Steelworkers of America v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 581–582, 80 S.Ct. 1347, 1352–1353, 4 L.Ed.2d 1409 (1960).

The exhaustion policy is rigorously applied in this Circuit. While it is said that an employee is not required to settle disputes through contractual procedures where a union breaches its fair representation duty, *Hines v. Anchor Motor Freight, Inc.,* 424 U.S. 554, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976), prior to suit against a union he must exhaust intraunion remedies where there is no question as to their adequacy and mandatory nature, *Newgent v. Modine Manufacturing Company,* 495 F.2d 919, 927 (7th Cir. 1974). It is no excuse that an employee may not have known about his intraunion remedies, *id.* at 928, or that he was misled by the union, *id.,* or that the union remedies do not provide all the relief an employee desires, *Baldini v. Local U. No. 1095,* 581 F.2d 145, 149 (7th Cir. 1978). The defense of failure to exhaust intraunion remedies is even available to an employ-

er in certain limited circumstances. *Harrison v. Chrysler Corporation,* 558 F.2d 1273, 1278–79 (7th Cir. 1977). *See also 1978 Seventh Circuit Review,* 54 Notre Dame Law. 489 (1979).

But this action does not involve such matters as an employee being discharged for being absent for three consecutive working days without notifying his employer, *Newgent, supra,* or an employee discharged for allegedly stealing company property, *Baldini, supra,* or an employee being discharged on grounds he falsified a production count, *Harrison, supra.* Plaintiff claims that he was wrongfully discharged for participating in a "payoff scheme that staggers the imagination" because he only did what he was told to do. This is not of the stuff that is "grist in the mills of arbitrators." It is entirely foreign to the "industrial common law."

Plaintiff's claim is not simply a difference or dispute as to the interpretation or application of a collective bargaining agreement. The extent that "orders" excuse conduct presents societal questions probing far beyond the close confines of the "shop." It is a matter rightfully for the courts.

to him over the course of his employment. Finally, it is argued that plaintiff was discharged for cause since his conduct during the term of his employment displayed a total lack of personal integrity.[8]

 Disputes over interpretations of good cause provisions of collective bargaining agreements are resolvable by summary judgment where there is no genuine issue of material fact, *S. J. Groves & Sons v. Intern. Bro. of Teamsters,* 581 F.2d 1241 (7th Cir. 1978). With some reluctance, and notwithstanding the many transgressions of Cox, the Court is of the view that defendant's argument still falls short of the mark. The reason for this is that although defendant has said much regarding why plaintiff could have been discharged, defendant has remained silent as to exactly why plaintiff was discharged.

When this Court makes a determination as to good cause *on a motion for summary judgment,* the "cause" it evaluates must be the "cause" that actuated the discharge. It seems entirely unfair, years after the fact, to allow an employer to rattle off the reasons it *could have* discharged an employee. Such hindsight can sharpen any employee's imperfections.

The test must go to *why* an employee was discharged, determined at a time proximate to the discharge. Such a view is entirely consistent with common sense, basic notions of fairness, and the need to have definite and concrete controversies brought forward for judicial determination. Moreover, this view is supportable by the very discretionary nature of a motion for summary judgment. 2 Moore, *Federal Practice and Procedure,* § 17.10[6] at 17–40.

Because defendant has said nothing in its Motion as to why in fact plaintiff was discharged, the Court can effectuate its view by looking to reasons the defendant gave for the discharge at a time proximate thereto. As previously mentioned, after his discharge, Cox secured the filing of a written grievance requesting that he be told the reasons why he was fired. By reading the depositions filed in this action, the Court learns that Walsh, in complying with this request, stated simply:

> "Wally B. Cox was terminated for reasons, one of which was the drastic reduction in work at the Burns Harbor job site, thus eliminating the need for a master mechanic."

Plaintiff subsequently applied for unemployment benefits. Again by a reading of the depositions the Court learns Walsh gave three reasons for his discharge to the Indiana Employment Security Division: (1) "He received commissions from vendors"; (2) "He initiated fraudulent major equipment repair requests"; (3) "The number of operating engineers has decreased at our Burns Harbor project so that a master mechanic is no longer required."

Defendant has made no showing in its Motion in regards to the reduction of the work force at the Burns Harbor Project. Although the defendant has stated that fraudulent equipment repairs were part of the "government jobs" scheme, defendant has not focused upon such repairs as a "cause" for plaintiff's discharge. This leaves receipt of commissions from vendors as the final, potential "good cause." It is

---

8. In partial support for this final reason, defendant points out that plaintiff admits to having provided money to be used to purchase women for Bethlehem Steel personnel:

> RYAN: Earlier you mentioned broads.
> COX: Right.
> RYAN: Did you use any of that money for women for Bethlehem people?
> COX: I didn't directly give the money to the women, but there was women bought for—paid for out of that, yes.
> RYAN: How did that come about?
> COX: Well, there is—broads were handled through Jim Freedman at that time.
> RYAN: That's the owner of Dunes Truck Service?
> COX: Right. He supplied the broads for the people and was paid.
> RYAN: By you?
> COX: And he paid the broads. I didn't pay the broads. There is some—I don't know, I think there is some bills that were paid by me, like different ones, but I don't recall at this time. I think that the records are in South Bend for them.
> RYAN: You mean bills for women?
> COX: Yes.
> (Cox Deposition p. 100).

possible that the alleged receipt of "gratuities" by Cox, mentioned in defendant's Motion, could be what was meant in the reference to the receipt of "commissions" in Walsh's statement to the Indiana Employment Security Division. But the Court does not care to guess, with the survival of plaintiff's action at stake.

In this light, it is seen that defendant has failed to argue a "cause" in its Motion that correlates with the "cause" given at the approximate time of plaintiff's discharge. The Court simply has nothing to legitimately base a "for cause" decision on; accordingly, such part of defendant's Motion arguing plaintiff's claims for breach of his employment contract should be dismissed because he was discharged for cause must fail.

The Court must emphasize, however, that it here so rules only because of the particular approach taken by defendant in its argument and not entirely because of the meritoriousness of plaintiff's argument. Plaintiff's assertion that he was insulated from discharge because he was carrying out "orders" troubles the Court, particularly in light of the fact that some of plaintiff's activities took on significant criminal proportions.

It stretches reasoned thinking to accept the argument that plaintiff could have been "forced" to do what he did and that he should, therefore, be excused from personal responsibility. Despite his claim of financial necessity, it would appear that other courses were open to the plaintiff. For example, if plaintiff had refused to be a member of a criminal team, and was discharged as a result of this refusal, grievance-arbitration or judicial relief would be appropriate to remedy the unjustified discharge. It seems an employee should seek relief from his employer before he joins a criminal enterprise, not after.

Additionally, it would seem reasonable to recognize that an organization needs to have the right to root out corruption in its midst. There has not even been an attempt to show the defendant was totally corrupt. Plaintiff's argument, followed out to its logical result, would mean that Atkinson could not discharge a corrupt employee unless and until it discharged every other employee involved in the same or similar corruption. This would hinder even the most earnest organization's attempt to start afresh. It would be difficult for the plight of any particular employee to outweigh the negative social implications of such a view of the law.

■ Yet this is certainly not to say that all the cards are stacked against the plaintiff. Plaintiff claims that he was discharged to "cover-up" the wrongdoing of his superiors. While it is far too premature to precisely plot the law that will evolve in this litigation, a workable rule would be that an individual cannot be discharged *solely* to "cover-up" for his superior's wrongdoing. Such a rule would not hinder the task of an organization making a good faith effort to clean its own house. In fact, this Court feels such a rule would work to encourage such efforts. And such a rule does justice to the discharged individual. No redeeming value offsets the harsh, compelled sacrifice of a "cover-up" discharge.[9]

*C. Damages for "Tax Related Problems."*

Defendant also argues that plaintiff's claim for damages must be dismissed insofar as it pertains to his having committed tax evasion. The plaintiff alleges that damages arising from the breach of his employment contract should include "expense in defending himself against both civil actions brought by the Internal Revenue Service and criminal actions brought by the Department of Justice" as well as "the indignity of serving jail time." The civil

---

**9.** Developments in other areas of the law may well set the course this litigation should hereafter follow. It will be incumbent upon plaintiff to show *prima facie* that he was discharged as part of a "cover-up." Defendant may then come forward with legitimate reasons for the discharge. Plaintiff may then have a fair opportunity to show that the stated reasons are just a pretext for a "cover-up" decision. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 686 (1973).

actions referred to are still pending and are all tax related. The criminal actions involved violations of § 7206(1) of the Internal Revenue Code and were resolved when the plaintiff pled guilty to criminal tax evasion for the calendar year 1969. Cox served a prison term as a result of his guilty plea.

 Any damages arising from the civil actions, the criminal actions, or the jail term are attributable to Cox's own illegal acts. An employee cannot recover damages which stem from acts the employee knew were illegal. 9 *Willison on Contracts* § 1016A (3rd Ed. 1967); *Restatement of Agency 2d* § 440(c). By pleading guilty to willfully and knowingly making false statements on his income tax return, plaintiff acknowledged consciousness of the nature of his acts. He has not, on this record, shown anything to the contrary. It follows that plaintiff is prevented from recovering any damages which stem from his "tax related problems" and defendant's Motion must be successful in this regard.

*D. Exemplary Damages.*

Defendant also requests partial summary judgment on the issue of exemplary damages. As is evident from the above discussion, plaintiff's claim sounds in contract. According to the Indiana Supreme Court, "[t]he general rule, recognized in Indiana . . . and throughout the United States . . . is that punitive damages are not recoverable in contract actions." *Vernon Fire & Cas. Ins. Co. v. Sharp,* 264 Ind. 599, 349 N.E.2d 173, 179 (1976). *Accord Hibschman Pontiac, Inc. v. Batchelor,* 340 N.E.2d 377 (Ind.App.1976); *Standard Land Corp. v. Bogardres,* 154 Ind. App. 283, 289 N.E.2d 803 (1972); 5 *Corbin on Contracts* § 1077 (1964). There are, however, exceptions to the general rule, as where conduct independently establishes a common-law tort, or where fraud, malice, gross negligence or oppression mingle in the controversy. *See, e. g., Vernon Fire, etc. v. Sharp,* 264 Ind. 599, 349 N.E.2d 173 (1976); Note *The Expanding Availability of Punitive Damages in Contract Actions,* 8 Ind.L.

Rev. 668 (1975). At first blush, plaintiff might seem to be able to work himself into an exception to the general rule. But upon deeper consideration of the facts before it, the Court is inclined to disagree.

The purpose of an award of punitive damages is to punish a wrongdoer and thereby deter others from engaging in similar conduct in the future. *Indiana & Michigan Elec. Co. v. Stevenson,* Ind.App., 363 N.E.2d 1254, 1262 (1977). This purpose does not fit the factual situation of this case in that there are, assuming the truth of plaintiff's allegations, wrongdoers on both sides of the lawsuit. It would be contrary to equitable principles and equal justice under law to allow one wrongdoer, admittedly guilty of criminal conduct, to recover punitive damages from another wrongdoer on the ground that the latter was the principal and the former merely his agent. The mischief that would be spawned by such a legal doctrine is obvious, and such a view has not been tolerated in other contexts. For example, when the parties to an illegal bargain are *in pari delicto,* the civil law will not allow a plaintiff to profit from his wrongdoing, preferring to merely leave him where it found him. *See* 6A *Corbin on Contracts* § 1534, *et seq.* (1962).

Accordingly, plaintiff is prevented from recovering exemplary damages.