STANDARD OIL COMPANY, Gulf Oil Corporation, Mobil Oil Corporation, Standard Oil Company of California, Atlantic Richfield Company, Shell Oil Company and Exxon Corporation, Plaintiffs,

v.

FEDERAL TRADE COMMISSION, Michael Pertschuk, Chairman, Paul Rand Dixon, Commissioner, Elizabeth Hanford Dole, Commissioner, David A. Clanton, Commissioner, Robert Pitofsky, Commissioner, and the United States of America, Defendants.

Civ. No. H 78–483.

United States District Court,
N. D. Indiana,
Hammond Division.

July 30, 1979.

Kirkland & Ellis, Chicago, Ill., for Standard Oil Company (Indiana).

John E. Bailey, Houston, Tex., for Gulf Oil Corporation.

Howrey & Simon, Washington, D.C., for Exxon Corporation and Shell Oil Corporation.

Singleton, Levy & Crist, Highland, Ind., Local Counsel, for all plaintiffs.

Pillsbury, Madison & Sutro, San Francisco, Cal., for Standard Oil Company (California).

Steptoe & Johnson, Washington, D.C., for Atlantic Richfield Company.

Donovan, Leisure, Newton & Irvine, Charles F. Rice, New York City, for Mobil Oil Company.

Michael N. Sohn, William A. E. Doying, Washington, D.C., for Federal Trade Commission.

Anthony J. Steinmeyer, Paul A. Gaukler, Washington, D.C., for Department of Justice.

Andrew B. Baker, Jr., Asst. U.S. Atty., Hammond, Ind., for United States of America (Local).

## MEMORANDUM OF DECISION

McNAGNY, District Judge.

Plaintiffs are seven of the eight respondents in a Federal Trade Commission ("FTC") adjudicative proceeding initiated on July 18, 1973, *In the Matter of Exxon Corp., et al.,* Docket No. 8934 (*"Dkt. 8934"*). Plaintiffs challenge certain aspects of that ongoing proceeding and have brought this action to secure declaratory and injunctive relief. The Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, and 1361. Venue is properly laid in this district under 28 U.S.C. § 1391(e) because plaintiff Standard Oil Company is incorporated and resides in the State of Indiana. Before the Court today are the cross motions for summary judgment tendered by plaintiffs and defendants. Both motions are granted in part and denied in part.

The reasoning of the Court is set forth below, and structured as follows. The Court will first set forth background information regarding *Dkt. 8934* and then state generally the relief sought by plaintiffs in this action. After a general discussion of the reviewability of *Dkt. 8934,* the Court will analyze the requested relief in detail. The Court will conclude by granting to plaintiffs certain extremely narrow relief concerning their discovery in *Dkt. 8934.*

## I. *DKT. 8934* BACKGROUND

The *Dkt. 8934* complaint, issued by the Federal Trade Commission on July 18, 1973 against the nation's eight largest petroleum companies, alleges three separate violations of Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45.[1] Certain acts and practices of plaintiffs, dating back to 1950, are said: (1) to constitute a combination or agreement to monopolize refining of crude petroleum products in the relevant markets; (2) to have maintained monopoly power over the refining of crude oil into petroleum products in the relevant markets; (3) and to have restrained trade and maintained a noncompetitive market structure in the refining of crude oil into petroleum products in the relevant markets. The first two alleged violations are Sherman Act-type charges. The third alleged violation would appear to be based solely on the FTC's general power to prevent what are perceived as "unfair methods of competition."

For purposes of the complaint, the relevant geographic market encompasses the Eastern and Gulf states, part of the Mid-Continent area, and relevant submarkets. The product market is the "refining of crude oil into petroleum products."

*Dkt. 8934* complaint counsel charge that an "intricate web of interrelationships" among the oil companies foster common rather than competitive interests. These interrelationships include joint ventures in crude oil production and pipeline transportation of crude oil, common ownership of plaintiffs, and indirect connections through interrelations with the financial community. Plaintiffs are said to have pursued a common course of action in refusing to sell gasoline and other refined products to independent marketers, in participating in restrictive or exclusionary exchanges and sales of gasoline and other refined products, and in entering into processing arrangements with independent refineries to avoid competition by limiting the availability of refined products to independent marketers.

---

1. A brief description of the Commission's organization will facilitate an understanding of this background information. The Commission itself, *i. e.,* the body of presidentially-appointed Commissioners, makes the decision to issue an administrative complaint. *See* 15 U.S.C. § 45(b) and 16 C.F.R. § 3.11. Having made that decision, the Commissioners thereafter deal with the matter in a judicial capacity. *See* 16 C.F.R. § 4.7. Conduct of the administrative trial or hearing, and all attendant functions, are delegated by the Commissioners to an administrative law judge, with the Commission retaining powers of review. *See* 16 C.F.R. § 0.14 and Part 3 generally. Advocacy or prosecution of the merits of the complaint is performed by "complaint counsel," who are staff members of one of the Commission's enforcement bureaus, in this instance the Bureau of Competition. *See* 16 C.F.R. §§ 0.15–0.16.

Plaintiffs are also charged with participating in restrictive or exclusionary transfers of crude among themselves, with having adhered to a system of posted prices to maintain an artificially high level of crude prices, and with accommodating the needs of each other in the transportation of crude through their ownership and control of transporting facilities.[2]

The effect of these alleged practices is said to have been to increase barriers to entry by keeping profits at the refining level artificially low and limiting the supply of crude oil available to independent refiners and potential entrants. According to complaint counsel, the acts and practices of plaintiffs have foreclosed actual and potential competition at all levels of the petroleum industry, have distorted the normal response of supply and demand for refined products, and have caused profits and returns on investment substantially in excess of those that would have been earned in a competitively structured market.[3]

In its contemplated relief, complaint counsel proposes that plaintiffs be divested of 40 percent to 60 percent of their refinery capacity, and that 10 to 13 new firms be established. To insure that the new refining companies would have access to major pipelines, complaint counsel further contemplates divestiture of those pipelines typically owned by the refinery, as well as the transfer to the new companies of fractional ownership shares in connecting joint venture pipelines.[4]

The plaintiffs have denied most of the complaint's allegations and have answered that "all of the acts . . . charged are the sole responsibility of the United States Government."[5]

To be sure, Dkt. 8934 is an adjudication of some moment:

No antitrust case in the history of American Jurisprudence approaches the potential impact of this proceeding. The Commission has challenged the *modus vivendi* of the largest American industry; complaint counsel have proposed relief that would restructure eight of the largest sixteen companies in the country and three of the largest five. Not even the historic Standard Oil case in 1911 rivals the importance or the size of this proceeding. That case dealt with the oil industry in its embryonic stage.[6]

Complaint counsel proposed, very early in the proceeding, that they be allowed three "waves" of discovery, in the fashion of the procedures suggested by the *Manual for Complex Litigation*.[7] During the first wave, selected employees and officers of plaintiffs were deposed on non-substantive aspects of the oil companies' organization and record-keeping. The second wave will consist of document production. During the third wave of discovery complaint counsel will depose employees and officials of the oil companies pertaining to substantive matters. The first wave of discovery by complaint counsel began in January of 1974. More than 63 oil company employees were interviewed or deposed. The second wave of discovery by complaint counsel is now under way as a result of subpoenas issued by the Administrative Law Judge on January 12, 1978,[8] as modified by an order dated

**2.** *See generally:* Complaint, Exxon Corp., No. 8934 (F.T.C., July 18, 1973), Smith Aff. Exh. 3; Prediscovery Statement for Complaint Counsel, Exxon Corp., No. 8934 (F.T.C., July 18, 1973), Smith Aff. Exh. 42; Note, *F.T.C. v. The Petroleum Industry: The Need For Consistent Regulatory Policy*, 24 Buffalo L.Rev. 761 (1975).

**3.** *Id.*

**4.** Prediscovery Statement, *supra*, note 2 at 137–41.

**5.** Hearing Transcript at 50.

**6.** Motion by Complaint Counsel for Issuance of Subpoena Duces Tecum to Respondents, Exxon Corp., No. 8934 (F.T.C., February 20, 1975), Smith Aff. Exh. 62.

**7.** Memorandum in Support of Application to Take Oral Depositions, Exxon Corp., No. 8934 (F.T.C. December 7, 1973), Exhibit A, Defendants' Motion for Summary Judgment.

**8.** Order Covering Issuance of Subpoenas Duces Tecum to Respondents Exxon Corp., No. 8934 (F.T.C., January 12, 1978), Smith Aff. Exh. 66.

Discovery subpoenas in Commission proceedings may be issued only upon approval of the Administrative Law Judge. 16 C.F.R. § 3.34. *See generally:* Bennett, *Post-Com-*

September 8, 1978.[9] Plaintiffs projected that compliance with the subpoena would require the search of over 400 million pages of documents and would require over 1500 man-years of effort at an expense in excess of $40 million, exclusive of the costs in time and money associated with disruption of other businesses which would necessarily result.

Although the motion practice of plaintiffs has been extensive,[10] and many collateral judicial actions have been initiated,[11] the oil companies have not as yet "been allowed substantial discovery on the Commission or on third parties."[12] It has been estimated that *Dkt. 8934* will not be heard by the Administrative Law Judge until the mid-1980's, and that the ultimate conclusion of the proceedings may not be reached until well into the 1990's, or, perhaps, until the year 2000.[13]

## II. PLAINTIFFS' REQUESTED RELIEF

The oil companies say they are entitled to the following declarations of their constitutional and statutory rights "and of Defendants' violations thereof:"[14]

a. That Plaintiffs have a constitutional and legal right to have Docket 8934 conducted as an adjudicative proceeding in accordance with Part 3 of FTC's Rules of Practice and Procedure, and not as an investigative search for a presently unknown case.

b. That Plaintiffs have a constitutional and legal right to receive advance notice of Defendant Federal Trade Commission's intention to obtain Plaintiffs' business records from other governmental agencies or other Federal Trade Commission officials not involved in Docket 8934, for use by Defendants in Docket 8934.

c. That Plaintiffs have a constitutional and legal right to have Defendants preserve records relating to the issues set forth in the Order Stating Issues, entered by the Administrative Law Judge in Docket 8934 on January 9, 1976, pending the granting of specific discovery requests addressed to Defendants by Plaintiffs in Docket 8934.

d. That each Plaintiff has a constitutional and legal right to a statement of the specific unfair acts or practices or unfair methods of competition being prosecuted against it in [Docket 8934].

e. That Plaintiffs have a constitutional and legal right to disclosure of any evidence in Defendants' possession supporting the charges being prosecuted against any Plaintiff in Docket 8934.

---

plaint *Discovery in Administrative Proceedings: The FTC as a Case Study*, 75 Duke L.J. 329 (1975); Note *Pretrial Discovery in Antitrust Cases*, 8 Mem.St.U.L.Rev. 615 (1978).

**9.** Order Ruling on Motions to Limit and Quash Subpoenas Issued on January 12, 1978, Exxon Corp., No. 8934 (F.T.C., Sept. 11, 1978), Smith Aff. Exh. 75, p. 42.

**10.** So far, the oil companies have filed more than 425 motions in *Dkt. 8934.*

**11.** *See*, e. g., *Standard Oil Company of California v. FTC* 596 F.2d 1381 (9th Cir. 1979) (FTC's satisfaction of the "reason to believe" requirement of 15 U.S.C. § 45(b)). *Exxon Corp. v. FTC*, 384 F.Supp. 775 (D.D.C.1974), *remanded* 527 F.2d 1386 (D.C.Cir. 1976) (Freedom of Information Act issues); *Exxon Corp. v. FTC*, 436 F.Supp. 1012 and 1019 (D.Del.1977), *remanded* 588 F.2d 895 (3rd Cir. 1978) (protective order issues); *Mobil Oil Corp. v. FTC*, 406 F.Supp. 305 (S.D.N.Y.1976) and 430 F.Supp. 849 (S.D. N.Y.1977) (Freedom of Information Act issues); *Mobil Oil Corp. v. FTC*, 430 F.Supp. 855 (S.D. N.Y.), *reversed* 562 F.2d 170 (2nd Cir. 1977)

(environmental impact statement issues); *FTC v. Anderson*, 442 F.Supp. 1118 (D.D.C.1977) (subpoena enforcement action); *Atlantic Richfield Co. v. FTC*, 546 F.2d 646 (5th Cir. 1977) (action challenging subpoena); *FTC v. Atlantic Richfield Co.*, 567 F.2d 96 (D.C.Cir. 1977) (subpoena enforcement action).

**12.** Order Denying Motions of Certain Respondents for the Issuance of Subpoenas Duces Tecum to the Federal Trade Commission, Exxon Corp., No. 8934 (F.T.C., November 1, 1978), Smith Aff. Exh. 57.

**13.** *See Exxon Corp. v. FTC*, 588 F.2d 895, 902 (3rd Cir. 1978); Hearing Transcript at 58.

**14.** These "declarations" are taken from the "Draft Order" attached as Exhibit 2 to Reply Memorandum in Support of Plaintiffs' Cross-Motion for Summary Judgment and in Opposition to Defendants' Cross-Motion for Summary Judgment. The Court has, however, changed the order of the declarations to accommodate its own analysis.

f. That Plaintiffs have a constitutional and legal right to equal and immediate discovery to prepare their defenses in Docket 8934.

Plaintiffs have also requested various orders that follow from and effectuate these declarations.

## III. INTERLOCUTORY REVIEW

It is critical to note that the plaintiffs are challenging various aspects of an *ongoing* agency proceeding. The relief sought will interject the Court into the proceeding prior to its resolution. As such the question that permeates each step of the analysis to follow is: whether interlocutory judicial presence is justified now, or whether plaintiffs must await direct review.[15] Plaintiffs answer the question primarily in terms of "ripeness," while defendants answer primarily in terms of "exhaustion of remedies." As will become apparent, both concepts address the same issue: reviewability of agency action.[16]

Plaintiffs focus on *Abbott Laboratories v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), in which certain drug interests sought declaratory and injunctive relief against regulations promulgated by a regulatory agency. The Supreme Court held that the particular factual situation justified "pre-enforcement" review of the regulations, stating:

> The injunctive and declaratory judgment remedies are discretionary, and courts traditionally have been reluctant to apply them to administrative determinations unless these arise in the context of a controversy "ripe" for judicial resolution. [The] basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties. The problem is best seen in a twofold aspect, requiring us to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration. *Id.* at 148–9, 87 S.Ct. at 1515.

*Accord: Toilet Goods Assoc. v. Gardner,* 387 U.S. 158, 162, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967); *Gardner v. Toilet Goods Asso.,* 387 U.S. 167, 170, 87 S.Ct. 1526, 18 L.Ed.2d 704 (1967).

The fitness of the issues for judicial decision is determined by whether the issues are

---

**15.** At the conclusion of the adjudicative hearing, a decision is rendered by the Administrative Law Judge. 16 C.F.R. § 3.51. This decision may be appealed to the Commission, 16 C.F.R. § 3.52, and the Commission may adopt, modify or set aside the findings and conclusions of the Administrative Law Judge. 16 C.F.R. § 3.54. Additionally, the rules provide for an interlocutory appeal of a decision by the Administrative Law Judge prior to the time of the hearing. 16 C.F.R. § 3.23(b).

Once the Commission has completed its review of the adjudicative proceedings, it decides whether cease-and-desist orders should be issued for those actions which are proved to be in violation of a statute. 15 U.S.C. § 45(b). This decision is appealable to a United States Court of Appeals, which has exclusive jurisdiction to review the orders of the FTC. 15 U.S.C. §§ 45(c) and (d). The Court of Appeals may affirm, enforce, modify or set aside orders of the Commission. *Id.*

**16.** *See* Leedes, *Understanding Judicial Review of Federal Agency Action: KafKaesque and Langdellian,* 12 U.Rich.L.Rev. 469 (1978):

> The exhaustion of remedies requirement controls the timing of judicial review; that is, *when* an individual challenging agency action is entitled to relief. In this respect, it is very similar to the doctrine of ripeness  .  .  .. *Id.* at 491 (Emphasis in original).

The author of this article lists five factors as being common to both ripeness and exhaustion analysis:

1. The nature and degree of the injury.
2. The nature of the question presented (legal, factual, mixed, discretionary, narrow or broad).
3. The obviousness of the agency error as it relates to the challenger (as shown by the record before the court).
4. The opportunity of the rightholder to obtain relief without court intervention, and the ability of the court to provide the challenger with meaningful relief.
5. The impact of judicial intervention on the orderly conduct of governmental business (including the court's business). *Id.* at 475.

purely legal or whether they require factual development, and whether there has been final agency action. *Abbott, supra,* 387 U.S. 149, 87 S.Ct. 1507. Final agency action is a "flexible" concept, to be interpreted in a "pragmatic" way. *Id.* The hardship to the parties is determined by the magnitude and immediacy of the impact likely to result from a denial of judicial consideration. *Id.* at 152, 87 S.Ct. 1507.

And the Third Circuit Court of Appeals has concluded,

[T]hat Abbott's teachings apply to *extra*-enforcement review rather than merely to *pre*-enforcement review. Thus, the significant question is . . . whether declaratory relief should be made available outside the channels normally provided for the challenge of agency action. *Exxon v. FTC,* 588 F.2d 895, 901 (3rd Cir. 1978). (Emphasis in original).

■ Defendants refer to *Hunt v. Commodity Futures Trading Com'n.,* 591 F.2d 1234 (7th Cir. 1979), in which their basic argument is expressed:

Absent special circumstances, the courts will not provide declaratory or injunctive relief interrupting administrative proceedings.

\* \* \* \* \* \*

It is a "long settled rule of judicial administration that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." This rule prevents courts from precipitously reviewing cases which, if the administrative process is allowed to run its course, may result in determinations favorable to a petitioner, thereby rendering his objections moot. Awaiting the conclusion of the administrative proceedings also insures that a record will be developed—including conclusions reached by the agency in its area of expertise—which can facilitate judicial review. And the exhaustion doctrine curbs frequent, litigious interference with the administrative procedures established by Congress for achieving the agency's goals.

\* \* \* \* \* \*

The exhaustion doctrine, of course, is not absolute. There are exceptional circumstances in which courts will interrupt administrative proceedings. *Id.* at 1236. (Citations omitted.)

*Accord: McKart v. United States,* 395 U.S. 185, 193–95, 89 . S.Ct. 1657, 23 L.Ed.2d 194 (1969); *Cox v. Guy F. Atkinson Co.,* 468 F.Supp. 677 (N.D.Ind.1979). The "clear right" exhaustion exception is generally accepted and formulated as follows: if an agency violates a clear right of a petitioner by disregarding a specific and unambiguous statutory, regulatory, or constitutional directive, a court will not require the petitioner to exhaust his administrative remedies and will intervene immediately. *See, e. g., Rosenthal & Co. v. Bagley,* 581 F.2d 1258, 1261 (7th Cir. 1978). A "clear" constitutional right is one likely to be "ultimately" accepted by the Supreme Court. *Id.* at 1262.

Naturally, the plaintiffs would have the Court believe this matter is "ripe" for review, and, on the other hand, the defendants urge the Court to forego review because, they say, the plaintiffs have not exhausted their administrative remedies and no exception to the exhaustion rule applies.

## IV. RIGHT TO AN ADJUDICATIVE PROCEEDING

The plaintiffs argue that they have a "right to have Docket 8934 conducted as an adjudicative proceeding in accordance with Part 3 of FTC's Rules of Practice and Procedure, and not as an investigative search for a presently unknown case." The plaintiffs support this assertion by a review of the history of *Dkt. 8934,* as well as certain statutes and regulations. The Court can accept much of their characterization of *Dkt. 8934,* but must, nonetheless, conclude that their arguments lead them nowhere.

In late 1971, the FTC issued a Resolution, Dkt. No. 721–0047, authorizing an investigation to determine whether firms in the petroleum industry were engaging in "unfair methods of competition" in violation of

Section 5 of the Federal Trade Commission Act. Very little was done in regards to this resolution for the next fifteen months. During May and July of 1973, a time in which the nation was experiencing temporary gasoline shortages, certain officials of the FTC advised members of Congress that there had been no formulation of definitive conclusions regarding the plaintiffs or others in the oil industry, let alone that they had done anything of an anti-competitive nature. For example, on July 6, 1973, the FTC submitted to Senator Jackson, Chairman of the Permanent Investigations Subcommittee of the Senate Committee on Government Operations, an undated report entitled "Preliminary Federal Trade Commission Staff Report on Its Investigation of the Petroleum Industry." This is the only staff report prepared prior to the issuance of the *Dkt. 8934* complaint. In a letter accompanying the report, FTC Chairman Lewis A. Engman cautioned that it "[had] not been evaluated or approved by the Commission and the findings and conclusions contained in the report do not necessarily reflect the views of the Commission." [17]

Nonetheless, on July 18, 1973, the *Dkt. 8934* complaint was filed. On October 23, 1974, the Administrative Law Judge initially assigned to *Dkt. 8934* recommended that the FTC should consider withdrawal of the complaint because of, *inter alia*, "the sweeping investigational nature of the discovery contemplated by complaint counsel which is inconsistent with an administrative policy of the Commission . . . ." [18]

After the retirement of the initial Administrative Law Judge, the current Administrative Law Judge renewed the recommendation that the FTC withdraw the complaint, primarily because of important changes in the petroleum industry that had occurred since mid-1973:

(1) integrated oil companies no longer have advantages because of the availability to them of cheap imported crude, (2) prices for crude will level at those set by OPEC and will not be set by integrated oil companies, (3) supplies of imported oil will also be established by OPEC, (4) integrated companies, primarily by reason of the repeal of the oil depletion allowance, will not squeeze refining profit margins in favor of higher crude prices and profits and (5) independent nonintegrated refiners will be able to secure all of their refining needs at the price level set by OPEC. [19]

The plaintiffs point out that the FTC Act and the FTC Rules draw a distinction between the investigative and the adjudicative functions of the Commission.

The FTC's investigational powers are defined in Section 6 of the FTC Act, 15 U.S.C. § 46(a); these powers are set forth in broad terms. And, as set forth by the Nonadjudicative Procedures contained in Part 2 of the FTC Rules, 16 C.F.R. §§ 2.1, *et seq.*, persons involved in investigative hearings have only limited rights to object and no right of cross-examination. 16 C.F.R. § 2.9. Additionally, investigative hearings are generally conducted before FTC staff; there is no provision for an Administrative Law Judge as in adjudicative proceedings. 16 C.F.R. § 2.8.

The FTC's adjudicative powers are more closely circumscribed. Section 5(b) of the FTC Act, 15 U.S.C. § 45(b), provides that adjudicative proceedings must be commenced by the issuance of a complaint stating the FTC's charges and must rest upon the FTC's "reason to believe" that a respondent already has engaged, or is engaged, in unfair methods of competition. Section 5(b) of the Act also provides for the intervention by other parties, the appearance of counsel, the entry of findings, and for judi-

---

17. Letter of Lewis A. Engman to Sen. Henry M. Jackson (July 6, 1973), Smith Aff. Exh. 81.

18. Order Certifying to the Commission Motion of Complaint Counsel for Integrated Procedural Relief, Exxon Corp., No. 8934 (F.T.C. October 23, 1974), Smith Aff. Exh. 85, at 3–4.

19. Certification to the Commission of Recommendation of Administrative Law Judge that Commission Consider Withdrawal of Complaint, Exxon Corp., No. 8934 (F.T.C., October 17, 1975), Smith Aff. Exh. 87, at 14.

cial review. The FTC's Rules of Practice for Adjudicative Proceedings, Part 3 of the Rules, 16 C.F.R. § 3.1, *et seq.*, provide for pleadings, motions, discovery, and other procedures comparable in many respects to those in the federal courts.

Discovery in investigative and adjudicative proceedings differs substantially. For example, in an investigation, the FTC staff may itself issue compulsory process, 16 C.F.R. § 2.7; in an adjudication, prior approval of the Administrative Law Judge must be obtained, 16 C.F.R. § 3.35. Additionally, the standard of relevancy in an investigative process is very broad whereas discovery under the adjudicative rules is based upon the specific allegations of the complaint.

The bottom line of the plaintiffs' argument is that the FTC put the cart before the horse in that it first issued a complaint and *then* left it to complaint counsel to initiate "massive" discovery. The inferences are said to suggest that a complaint issued because of political pressures, forcing complaint counsel to initiate "massive" discovery in the hope that something will turn up to save face at the FTC. Complaint counsel's opposition to plaintiffs' discovery demands[20] is further said to indicate that there is no evidence, and there never was evidence, to support the complaint.[21]

Counsel for defendants have done little to respond to plaintiffs' argument other than to suggest that the plaintiffs should be thankful the proceeding is in adjudication because, if it were in an investigative stage, plaintiffs might be faced with even more massive discovery. Nonetheless, the Court is in complete agreement with at least one observation of defendants. Despite plaintiffs' attempt to characterize their argument as being that adjudicative proceedings may not be subverted for investigative purposes, their real issue is whether the "reason to believe" standard, 15 U.S.C. § 45(b), was observed when the complaint issued in *Dkt. 8934.* As will be detailed *infra,* the "massive" discovery by complaint does not *per se* offend due process. And nothing in the FTC Act or rules proscribes post-complaint discovery. So, as long as the "reason to believe" standard has been met, the plaintiffs have no actionable claim.

The case of *Standard Oil Co. of Cal. v. F.T.C.,* 596 F.2d 1381 (9th Cir. 1979), is critical to the Court's evaluation of this argument.[22] In that case, one of the plain-

---

**20.** Although Texaco, Inc., one of the eight oil companies named in the administrative complaint has not joined in this suit, to avoid confusion the Court will follow the practice of the parties and denominate the eight respondents to the administrative complaint as "plaintiffs." Similarly, the Court will denominate all discovery movants as "plaintiffs" even though not all discovery requests were joint motions of all the plaintiffs. The Court is aware that some of the actions described as having been taken by "the plaintiffs" were taken not by any of the seven companies before the Court but by Texaco.

**21.** In the Supplemental Reply of Exxon Corporation in Support of Plaintiffs' Motion for Summary Judgment and in Opposition to Defendants' Cross-Motion for Summary Judgment, plaintiff Exxon has taken a more "radical" stance than the other plaintiffs and urged that *Dkt. 8934* be immediately dismissed by this Court. Counsel for Exxon suggests *Dkt. 8934* was a product of political "nudging", Hearing Transcript at 59, and that the FTC would appreciate this Court taking them "off the hook." They simply cannot dismiss *Dkt. 8934,* counsel for Exxon says, after spending sixteen million

dollars on it and after having 200 people working on it. Hearing Transcript at 53.

Courts are not powerless to protect against political taint on administrative activity. *See, e. g.,* Note, *Judicial Limitation of Congressional Influence on Administrative Agencies,* 79 Nw. U.L.Rev. 931 (1978); Note, *Judicial Control of Systemic Inadequacies in Federal Administrative Enforcement,* 88 Yale L.J. 407 (1978). But there has been no showing that *Dkt. 8934* is "solely" the creation of political pressures. *See Standard Oil Co. of Cal. v. F.T.C.,* 596 F.2d 1381, 1384 (9th Cir. 1979). And the FTC's efforts in *Dkt. 8934* can *still* be said to have some backing. *See* Adams, *Vertical Divestiture of the Petroleum Majors: An Affirmative Case,* 30 Vand.L.Rev. 1115 (1977). Moreover, Exxon's approach would have this Court cast aside all confidence in the FTC's ability to properly conduct its basic functions. While plaintiffs' portrayal of *Dkt. 8934* is certainly effective at creating doubt, the Court is not prepared to go as far as Exxon requests.

**22.** In fairness to plaintiffs it must be noted that the SOCAL decision had not been handed down when plaintiffs filed their motion for summary

tiffs in this action (SOCAL) sought review of the FTC's stated determination in *Dkt. 8934* that it had "reason to believe" SOCAL was engaged in monopolistic practices in violation of the law. The Ninth Circuit concluded that what constitutes "reason to believe" is unreviewable because the "reason to believe" determination is committed to the FTC's discretion. However, the court also concluded that the issue of whether the FTC did or did not in fact make a "reason to believe" determination *is* reviewable.

■ This Court agrees. As stated by the Ninth Circuit:

> The necessary companion to the FTC's power to develop in the first instance the meaning of the statutory term "unfair" is the power to determine whether there is "reason to believe" that a party is engaged in "unfair" conduct. Judicial intervention in this legitimate decision making process would serve only to hamper or thwart the FTC's exercise of the power granted to it by Congress. 596 F.2d at 1385.

But the Court also agrees that the question of whether in fact a "reason to believe" determination was made is reviewable because, in this instance, the requirement itself provides "law to apply," *see Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), and because the 5 U.S.C. § 704 finality element would be satisfied. As explained by the Ninth Circuit in reference to SOCAL:

> In this case, SOCAL has exhausted administrative remedies by raising its claim before the FTC. SOCAL is presently obligated to respond in administrative proceedings that allegedly have been initiated in an unlawful manner. Without review now, the alleged unlawfulness is likely to become insulated from any review. If SOCAL should prevail in the FTC proceedings, the claims raised now would become moot and, therefore, unreviewable. Moreover, assuming that a

court of appeals could properly entertain SOCAL's present claims upon review of a cease and desist order under 15 U.S.C. § 45(c), it is unlikely that the record of the completed administrative proceedings would be sufficient to determine the claims for the simple reason that the FTC has already rejected them on legal grounds and thus foreclosed SOCAL from developing relevant facts. Furthermore, an appellate court would proceed to consider only whether the FTC order is supported by the evidence and a reasonable legal theory, and, therefore, would have no reason to reach the issue raised by SOCAL of an unlawful complaint. We therefore find that the issuance of the FTC complaint number 8934 was a "final agency action" as to SOCAL. *Id.* at 1387 (Citations omitted).

■ But the plaintiffs have not developed a record in this action that convinces the Court that "the complaint was issued solely because of outside pressure or with complete absence of a 'reason to believe' determination," *id.* at 1386; on the contrary, the record indicates that the Commission did honor its minimum statutory obligations. And it is simply a fact of life that in major adjudications much discovery will be post-complaint discovery. The FTC's decision to measure the competitive condition of the petroleum industry against the antitrust laws necessitates expensive, burdensome, and lengthy investigation and adjudication. The law gives the Commission great discretion in deciding when to move from an investigative to adjudicative stage. There is nothing in this record that convinces the Court that this standard has been abused, at least under the standards so recently set forth in *Standard Oil Co. of Cal. v. F.T.C., supra.* Accord generally *F.T.C. v. Anderson*, 442 F.Supp. 1118, 1127 (D.D.C.1977).

## V. RIGHT TO NOTICE OF OUTSIDE INFORMATION

■ Plaintiffs contend they have "a constitutional and legal right to receive ad-

---

judgment. Because review of the district court's dismissal was still pending, plaintiffs

hedged their bets and raised this particular issue here, too.

vance notice of Defendant Federal Trade Commission's intention to obtain Plaintiffs' business records from other governmental agencies or other Federal Trade Commission officials not involved in Docket 8934, for use by Defendants in Docket 8934." Plaintiffs have offered little support for this declaration; it seems to have been added in the hopes of giving momentum to other arguments. The Court is basically of the view that the plaintiffs have played this hand and lost. The result will not be changed here.

In *F.T.C. v. Atlantic Richfield Co.*, 185 U.S.App.D.C. 229, 567 F.2d 96 (D.C.Cir. 1977), the District of Columbia Court of Appeals, in a subpoena enforcement action, faced an issue similar to the issue posed by plaintiffs in this action. Atlantic Richfield, a respondent in *Dkt. 8934* and a plaintiff here, found itself the subject of an FTC resolution authorizing its staff to gather information on the structure, conduct, and performance of the natural gas industry. It was argued that the prosecutorial staff in *Dkt. 8934* should not have access to materials obtained through the mechanism of the investigative subpoena without approval of the Administrative Law Judge and notice to Atlantic Richfield. The court stated that:

> [A] reason for our concern emanates from the due process arguments raised by Atlantic in the course of these proceedings. . . . We are prepared to assert . . . that this area of inquiry— one which deals with such basic notions as notice and opportunity to be heard— inherently raises questions relating to due process . . . . 185 U.S.App.D.C. at 236, 567 F.2d at 103.

The court remanded the issue to the Commission with the observation that: "If Atlantic is dissatisfied with the Commission's construction of its rules, Atlantic can raise these claims in the context of an appeal from the final decision of the agency in the adjudicative proceeding." *Id.* 185 U.S.App. D.C. at 240, 567 F.2d at 107.

On remand, the Commission ruled:

> It has long been, and continues to be, the Commission's interpretation of its rules for adjudicative proceedings that Commission counsel in such a proceeding may properly have access to, and use for that proceeding, documents or information otherwise properly obtained by the Commission—whether through compulsory, process or otherwise, whether confidential or not—and that such access and use may occur without leave of the ALJ and without notice to respondent.[23]

In reaching this decision, the Commission paid particular attention to due process principles, the language, structure, and purpose of its rules, and the practical, public policy reasons for that interpretation.

The Court agrees with the Commission that the plaintiffs have no "right" to receive advance notice when complaint counsel receives information outside the discovery process of *Dkt. 8934*. Basic fairness is assured by other means, e. g., through any applicable strictures concerning *ex parte* communications and the fact finder's obligation to base decisions upon the evidence of record. And, in any event, plaintiffs have offered no persuasive arguments why the Court should not follow the view of District of Columbia Court of Appeals that this matter can await review "in the context of an appeal from the final decision of the agency in the adjudicative proceeding." [24] 185 U.S.App.D.C. at 240, 567 F.2d

---

**23.** *In the Matter of Subpoena Duces Tecum Addressed to Atlantic Richfield Co., et al.*, No. 741–0019 (F.T.C., June 2, 1978), Exhibit A to the Answer.

**24.** And, as pointed out by the Fifth Circuit, in a case collateral to the D.C. Circuit's *Atlantic Richfield* case:

> Furthermore, Atlantic may still enforce all of its due process protections in the Exxon adjudicative proceeding itself and in an ap-

peal from any adverse decision. If the FTC acts improperly or illegally in obtaining evidence for the adjudicative proceeding with investigatory subpoenas, Atlantic should be entitled to have any evidence so obtained— as well as its "fruits"—excluded from the proceeding or to obtain a reversal of any adverse judgment founded upon improperly admitted "tainted" evidence.

*Atlantic Richfield Co. v. FTC*, 546 F.2d 646, 651 (5th Cir. 1975).

at 107. The argument that the District of Columbia Court of Appeals would decide the matter differently today because the matter is further "down the pike" and "not even close to ultimate appeal"[25] is simply not sufficient.

## VI. RIGHT TO PRESERVATION OF RECORDS

■ Plaintiffs also contend that they "have a constitutional and legal right to have Defendants preserve records relating to the issues set forth in the Order Stating Issues, entered by the Administrative Law Judge in Docket 8934 on January 9, 1976, pending the granting of specific discovery requests addressed to Defendants by Plaintiffs in Docket 8934." Plaintiffs have also not pushed for this declaration, and the Court will not make this declaration because of plaintiffs' obvious failure to exhaust their administrative remedies.

On May 28, 1975, the plaintiffs moved for an order directing the FTC and other specified governmental agencies to preserve from destruction records which they considered relevant to *Dkt. 8934.* The Administrative Law Judge found the proposed order to be "unduly broad and burdensome" and to "clearly [encompass] vast quantities of documents clearly irrelevent" to *Dkt. 8934.*[26] The Administrative Law Judge felt the order "would require the preservation of all documents reflecting the thought processes of thousands of government employees; and countless millions of documents would be involved."[27] He observed that because *Dkt. 8934* was not "an action to try the government, documents evidencing and underlying government intent and planning" were not relevant.[28] He therefore denied plaintiffs' request for a broad preservation order, *without ruling out issuance of a narrower order on a proper showing.*

Plaintiffs are not free to so easily forsake the administrative forum. There is absolutely no indication that the Administrative Law Judge unreasonably refused to subsequently consider some type of preservation order, or that the only type of preservation order that he would consider was unreasonable. To put it simply, plaintiffs must really try to make a go of it at the administrative level before turning to the courts for relief. They certainly have not made an adequate record for interlocutory relief in this regard. There must be much more of a showing that they tried to come to terms with the Administrative Law Judge.

And it is not enough for the plaintiffs to say, as they have,[29] that the language of their proposed preservation order tracks the language of a preservation order entered against them by the Administrative Law Judge. In the exercise of his discretion, the Administrative Law Judge may have indeed perceived differences between the government and eight of the sixteen largest corporations in the nation.[30]

## VII. RIGHT TO STATEMENT OF SPECIFIC ACTS AND PRACTICES

Plaintiffs also contend that "each Plaintiff has a constitutional and legal right to a statement of the specific unfair acts or practices or unfair methods of competition being prosecuted against it in [Docket 8934]." This declaration gives rise to questions of discovery as well as to specificity of the charges in *Dkt. 8934.* The latter question can be thought of in terms of notice.

All matters regarding discovery will be dealt with *infra.* Here the Court considers only specificity and, like the court in *F. T. C. v. Anderson,* 442 F.Supp. 1118 (D.D.C. 1977), another *Dkt. 8934*-related action, the Court concludes that "it is apparent that

---

**25.** Hearing Transcript at 43.

**26.** Order . . . Denying Motion of Certain Respondents for Order Directing Particular Government Departments and Agencies to Preserve Documents, Exxon Corp., No. 8934 (F.T.C., July 24, 1975), Smith Aff. Exh. 29, at 7.

**27.** *Id.* at 7–8.

**28.** *Id.* at 8.

**29.** Hearing Transcript at 42.

**30.** *Id.* at 43.

the complaint is specific enough to advise [the plaintiffs] of the charges against [them] . . . ." *Id.* at 1127.

■ It is beyond dispute that the traditional concepts of procedural due process apply with full force to administrative proceedings, *Morgan v. United States*, 304 U.S. 1, 58 S.Ct. 773, 82 L.Ed. 1129 (1938), and that administrative agencies are bound by the requirements of procedural due process to give a defendant prompt notice of the factual predicates of the government's case. *See, e. g., Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 288, 95 S.Ct. 438, 443 n.4, 42 L.Ed.2d 447 (1974) ("A party is entitled, of course, to know the issues on which decision will turn and to be apprised of the factual material on which the agency relies for decision so that it may rebut it"); *Hannah v. Larche*, 363 U.S. 420, 442, 80 S.Ct. 1502, 1514, 4 L.Ed.2d 1307 (1960) ("[W]hen governmental agencies adjudicate to make binding determinations which directly affect the legal rights of individuals, it is imperative that those agencies use the procedures which have traditionally been associated with the judicial process"); *Chicago, Milwaukee, St. Paul & P. R. Co. v. United States*, 585 F.2d 254, 260 (7th Cir. 1978) ("Fundamental fairness in administrative proceedings requires notice clearly informing a party of the proposed action and the basis for that action"). These constitutional precepts were embodied by Congress in the Administrative Procedure Act. The Act provides, in pertinent part, that, "Persons entitled to notice of an agency hearing shall be timely informed of . . . the matters of fact and law asserted." 5 U.S.C. § 554(b)(3).

Three documents are relevant to a determination of whether plaintiffs have been adequately advised of their acts and practices alleged to be illegal. These are: 1) The Complaint;[31] 2) the 141 page "Prediscovery Statement" filed by complaint counsel on February 22, 1974, outlining the principal facts to be proven against each plaintiff and a statement of the legal and factual issues created by the pleadings;[32] 3) and complaint counsel's application for the January 12, 1978 subpoenas which included a "detailed discussion of the issues in [*Dkt. 8934*]."[33]

■ The failure to give adequate notice would certainly be reviewable at an interlocutory stage. But this simply is not such a case. The Court has read *each and every* page of the three documents listed above, and finds that plaintiffs have not been slighted on their notice rights.[34] They have been advised enough to frame an answer and to understand the issues they will be required to meet. And the Court feels plaintiffs *do* understand the charges; despite their protests, it is their comprehension, not any lack of comprehension, that is the real source of the problem.

Counsel for plaintiffs have made much of the fact that this is an unprecedented "structure" case and that complaint counsel has attacked oil exchange agreements that have "long been prevalent among all companies in the petroleum industry, and have never been held to involve any illegality."[35] Suffice it to say that the Commission has broad powers under 15 U.S.C. § 45(a) and that it may find unlawful under Section 5 trade practices which would not violate the Sherman Act or other traditional antitrust statutes. *See, e. g., FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 92 S.Ct. 898, 31 L.Ed.2d 170 (1972); *FTC v. Texaco*, 393 U.S. 223, 89 S.Ct. 429, 21 L.Ed.2d 394 (1968); *Atlantic Refining Co. v. FTC*, 381 U.S. 357, 85 S.Ct. 1498, 14 L.Ed.2d 443 (1965); *FTC v. Cement Institute*, 333 U.S. 683, 68 S.Ct. 793, 92 L.Ed. 1010 (1947).

---

**31.** *See* note 2, *supra.*

**32.** *Id.*

**33.** Order Denying Joint Motion of Respondents to Require Complaint Counsel to Specify Legal and Factual Issues, Exxon Corp., No. 8934, (F.T.C., May 30, 1978), Smith Aff. Exh. 54, at 3.

**34.** Counsel for Exxon referred to the Prediscovery Statement as "141 pages of pure, unadulterated rubbish." Hearing Transcript at 49. This characterization is *very* wide of the mark.

**35.** Memorandum In Support of Plaintiffs' Motion for Summary Judgment on Their Amended Complaint at 32.

Although all people may not agree on the wisdom of attacking the *modus operandi* of the oil companies, and notwithstanding the potential drastic consequences for plaintiffs, the decision was and remains the prerogative of the FTC. No actionable abuse has been demonstrated to the Court.

## VIII. RIGHT TO DISCOVERY

Plaintiffs contend that they have "a constitutional and legal right to disclosure of any evidence in Defendants' possession supporting the charges being prosecuted against any Plaintiff in Docket 8934" and that they have "a constitutional and legal right to equal and immediate discovery to prepare their defenses in Docket 8934." Although the plaintiffs ask for far too much, it is, and only is, the matter of discovery that compels the court to intervene in *Dkt. 8934.*

It is uncontested that the history of *Dkt. 8934* demonstrates that plaintiffs' discovery efforts have been stymied.[36] Fifteen of plaintiffs' seventeen discovery requests were denied in their entirety. Of the remainder, the documents produced were either from the public record or heavily masked. Plaintiffs have not been permitted a single deposition in the over seventy months since *Dkt. 8934* began. Discovery by complaint counsel has been, to say the least, more extensive. This includes informal efforts:

We have contacted every federal agency with responsibility for any regulation or data collection concerning the petroleum industry. Numerous federal officials have been interviewed about both past and present conditions in the industry. Similarly, state agencies with petroleum responsibilities have been contacted about information and data relevant to the issues of this case.

Individuals outside the government have also been a resource in the preparation of this subpoena. Employees and officers of both major and independent oil companies have provided us with helpful assist-

36. On December 18, 1973, plaintiffs moved to discover documents underlying the Preliminary Federal Trade Commission Staff Report on Competition in the Petroleum Industry. The ALJ denied production of third-party documents; the documents produced consisted of three boxes of publicly available materials obtained from state and federal agencies. On February 14, 1974, plaintiffs requested certain government documents that they claim, would show their alleged illegal conduct was influenced by the government. The ALJ denied these requests. On March 29, 1974, plaintiffs sought to depose 11 government officials. The ALJ denied these requests. On April 18, 1974, plaintiffs sought to discover the identity of any witness interviewed in connection with the issuance of the *Dkt. 8934* complaint. This request was denied by the ALJ. On March 19, 1975, plaintiffs moved to subpoena documents from seven government agencies concerned with the oil industry. The ALJ denied this request. On March 18, 1975, plaintiffs moved to subpoena documents underlying several FTC staff reports on the petroleum industry. The ALJ granted this request in part, but the documents produced consisted of heavily masked pages containing data about the petroleum industry generally. On April 9, 1975, plaintiffs requested documents underlying FTC economic studies of the industry. The ALJ denied these requests. On May 28, 1975, plaintiffs moved to subpoena file indices that would indicate the whereabouts of certain documents. The ALJ denied any discovery. On May 28, 1975, plaintiffs moved for a preservation order that was eventually denied by the ALJ. On September 2, 1975, plaintiffs moved to depose individuals that complaint counsel had listed as witnesses. The ALJ denied the request. On November 22, 1975, plaintiffs moved to subpoena documents underlying four post-complaint staff reports related to the petroleum industry. The ALJ denied the request. On February 13, 1976, plaintiffs requested documents serving as the basis for a particular statement in the staff reports. This request was denied. On April 17, 1978, plaintiffs sought to subpoena an FTC economic report and to depose the government official who had ordered the report prepared. The ALJ denied the requests. On August 1, 1978, plaintiffs' requested notification of documents produced for *Dkt. 8934* from other governmental agencies or unrelated proceedings. The ALJ denied the request. On April 17, 1978, plaintiffs moved for a further statement of the issues. The ALJ denied this request. Discovery requests on April 26, 1978 and October 2, 1978 and October 7, 1978 were also denied by the ALJ.

Plaintiffs also claim that "other prehearing procedures have also failed to disclose the details or any evidentiary basis for the FTC's case." The previously discussed Prediscovery Statement was a product of these prehearing procedures.

ance in developing background about those areas of respondents' operations that now require document discovery.[37] As part of the extensive "first wave" of nonsubstantive interviews and depositions, complaint counsel interviewed or deposed sixty-three employees and officers of the oil companies about the organizational structure, documents, and record-keeping policies of the oil companies. By order of November 11, 1976, the Administrative Law Judge granted a portion of a complaint counsel request that included the production of hundreds of thousands of pages of file indices for all of plaintiffs' stored documents, organizational charts for plaintiffs and their major subsidiaries back to 1950, lists of all domestic and foreign companies in which plaintiffs had any ownership interest since 1950, responses to governmental inquiries relating to plaintiffs' refinery, pipeline, and other operations, and materials describing plaintiffs' computerized data. The Administrative Law Judge issued a subpoena on January 12, 1978, that marked the beginning of complaint counsel's substantive discovery, and sought information into every phase of plaintiffs' worldwide petroleum operations beginning as early as 1946. Plaintiffs projected that compliance with the subpoena would mandate the search of over 400 million pages of documents and would require over 1500 man years of effort at an expense in excess of $40 million, exclusive of the costs in time and money associated with disruption of their businesses which would necessarily result. The subpoena was subsequently modified in an effort to reduce plaintiffs' burden.

▇▇▇ The essence of due process, for present purposes, is the requirement of prior notice of the charges against a person and a fair opportunity to be heard before being finally deprived of life, liberty, or property by the government, as those terms are defined within the meaning of the Fifth Amendment of the Constitution. *See, e. g., Mathews v. Eldridge*, 424 U.S. 319, 332–35,

345–46, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); *Withrow v. Larkin*, 421 U.S. 35, 46–55, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975); *Hannah v. Larche*, 363 U.S. 420, 430–52, 80 S.Ct. 1502, 4 L.Ed.2d 1307 (1960); *Greene v. McElroy*, 360 U.S. 474, 496–99, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959); *FTC v. Cement Inst.*, 333 U.S. 683, 700–02, 709, 68 S.Ct. 793, 92 L.Ed. 1010 (1948). There can further be no doubt, and the parties do agree, that this due process requires that plaintiffs, in the *adjudicatory Dkt. 8934* administrative proceeding, are entitled to appropriate discovery in time to reasonably and adequately prepare themselves, and their defenses, before facing the charges in the administrative "trial." *See, e. g., Morgan v. United States*, 304 U.S. 1, 58 S.Ct. 773, 82 L.Ed. 1129 (1938). But nothing in the Constitution mandates that plaintiffs are entitled to "any evidence" in the hands of complaint counsel, or that plaintiffs are entitled to discovery "equal" to the discovery of complaint counsel. There are a number of well-established limitations on a litigant's discovery rights that have not been thought to offend due process. For example, the principle underlying the work-product doctrine and the attorney-client and other privileges, for reasons reflecting sound public policy, limit a litigant's right to be aware of what opposing counsel may know. *See* Fed.R. Civ.P. 26(b), (c); *Hickman v. Taylor*, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947); *Goldberg v. United States*, 425 U.S. 94, 105–06, 96 S.Ct. 1338, 47 L.Ed.2d 603 (1976); *Mead Data Cent., Inc. v. United States Dep't of the Air Force*, 184 U.S.App.D.C. 350, 360–61, 362 n.25, 566 F.2d 242, 252–53, 254 n.25 (1977); *Kent Corp. v. NLRB*, 530 F.2d 612, 623 (5th Cir.), *cert. denied*, 429 U.S. 920, 97 S.Ct. 316, 50 L.Ed.2d 287 (1976).

A similar discovery issue was presented to the court in *Exxon Corp. v. F. T. C.*, 411 F.Supp. 1362 (D.D.C.1976), an action attacking a document preservation order entered by the Administrative Law Judge in *Dkt. 8934*. There the court wrote:

---

**37.** Motion by Complaint Counsel for Issuance of Subpoenas Duces Tecum to Respondents,

Exxon Corp., No. 8934 (F.T.C., February 20, 1976), Smith Aff. Exh. 62, at 14.

Plaintiffs also urge that their due process rights were violated by the failure of the Administrative Law Judge to include government agencies other than the FTC in the Order. Plaintiffs base this claim on an expansive reading of *Wardius v. Oregon* [412 U.S. 470, 93 S.Ct. 2208, 37 L.Ed.2d 82 (1973)] which they assert has created a due process right to "equal discovery." If the Order here were such as to actually deprive the oil companies of discovery, the Court might take a different view. . . . The holding in *Wardius* was not that every order against a defendant must be matched by a countervailing order to the other side. It was rather that discovery was to be a "two way street" so that a defendant could not be required to divulge his own case while "subjecting him to the hazard of surprise concerning refutation of the very pieces of evidence which he disclosed . . .'' Thus, assuming that *Wardius* applies in civil proceedings before administrative agencies, a question on which this Court expresses no view, there has been no showing of a violation sufficient to give rise to constitutional objections. 411 F.Supp. at 1370–71.

*Accord Sperry & Hutchinson Co. v. FTC,* 256 F.Supp. 136 (S.D.N.Y.1966):

Moreover, even assuming there is a statutory right of "equal" access to evidence, it could scarcely be said to require such access at any particular time or at any particular stage in the proceeding. Nor would it include access to any evidence which is not shown to be necessary to the defense. There is no showing here that access to any such material will necessarily be denied in this adjudicative proceeding.

It is true that the Commission has had facilities for investigation not available to a private litigant, as is customarily the case with Government agencies. But to hold, as Sperry urges, that a respondent is therefore entitled to what appears to be tantamount to a complete disclosure of the Commission's files would be to fashion a new rule in administrative proceedings of very wide implications which would not be in the public interest. No authority has been cited to me which approves such a rule and I know of none. *Id.* at 144.

The real question is, as counsel for the parties seem to agree, one of "timing." Defendants say that plaintiffs are merely challenging the legality of a series of discovery rulings of the Administrative Law Judge. Defendants point out that each of these rulings were expressly justified on a number of grounds. For example, the Administrative Law Judge disallowed plaintiffs some discovery because it would have involved divulging sensitive business information.[38] Other examples include discovery requests that were denied on grounds of relevancy[39] and as being premature.[40] But defendants are careful to point out that the Administrative Law Judge has repeatedly indicated that he fully intends to *eventually* afford plaintiffs all appropriate discovery. He has, defendants say, simply not allowed them to conduct counsel's initial substantive discovery and has, as discussed above, ruled certain discovery requests out of bounds on one ground or another. The Administrative Law Judge is said to be exercising his inherent discretion as a "trial judge" to manage an unusually large and complicated case. Defendants say that based upon his everyday and intimate knowledge of the case he has chosen a particular course to steer this difficult matter to trial.

On most points, the Court agrees with defendants, and would avoid second-guessing the Administrative Law Judge, despite

---

**38.** Order Modifying Discovery Order Dated March 17, 1975, Exxon Corp., No. 8934 (F.T.C., August 6, 1975), Smith Aff. Exh. 19, at 8.

**39.** Order Denying Application for the Issuance of Additional Subpoenas, Exxon Corp., No. 8934 (F.T.C., May 8, 1975), Smith Aff. Exh. 25, at 8.

**40.** Order Denying Motion of Exxon Corporation for Issuance of Subpoenas Ad Testificandum, Exxon Corp., No. 8934 (F.T.C., September 1, 1975), Smith Aff. Exh. 46, at 4.

some rulings that seem unreasonable, and notwithstanding plaintiffs' generalized claim that while the Administrative Law Judge delays their discovery, important witnesses can be expected to die or suffer inevitable memory loss, and that relevant documents are certain to be lost. The Constitution simply does not give them the unfettered right to concurrent discovery, see *Sperry & Hutchinson Co., supra,* even considering the fact that *Dkt. 8934* is an exceptionally large case that is already over six years old. And although the *Manual for Complex Litigation* § 0.50 says that concurrent discovery is *generally* the most fair way to proceed, it does not say that complex cases must *always* proceed that way. And although one might argue that concurrent discovery is a general Federal Trade Commission policy, see, e. g., *All-State Industries of North Carolina, Inc., et al.,* 72 F.T.C. 1020 (1967), the Commission certainly has not locked itself into such a course for every case. *See Report of the Working Group on Complex Antitrust Procedure,* Smith Aff. Exh. 2.

██ The Court has one problem, however, that precludes the case from ending here. In denying one of plaintiffs' final attempts at discovery in *Dkt. 8934*, the Administrative Law Judge said:

I am indeed aware that the complaint in *Exxon* is more than five years old, and that respondents have not yet been allowed substantial discovery on the Commission or on third parties. Without reiterating the reasons given in prior orders denying respondents discovery, the fact remains that, at the present time, complaint counsel have not received sufficient information from respondents pursuant to the two outstanding subpoenas for complaint counsel to undertake a review and re-evaluation of their case based upon respondents' returns and on the basis of such an evaluation to revise and streamline their approach. In my

opinion, the initial discovery on respondents that has been allowed is preliminary to complaint counsel's re-evaluation and narrowing of the issues. I anticipate that complaint counsel will make such a re-evaluation as they have stated. . .

As a general proposition, I agree with respondents' arguments that concurrent discovery for both complaint counsel and respondents is desirable. However, in the circumstances of this case, I believe that the benefits of initial discovery on respondents, enabling complaint counsel to narrow the issues, will outweigh whatever harm might be visited upon respondents by delay in their discovery.[41]

All parties have agreed that this order cuts off discovery by plaintiffs until they have made returns on the subpoena issued by the Administrative Law Judge on January 12, 1978, i. e., until the end of the second, substantive wave of discovery. There is some disagreement as to how long this may be. Counsel for defendants suggest that this may occur by 1980, fifteen to twenty months after issuance of the subpoena.[42] Plaintiffs estimate that discovery could be cut off for another three years, which seems to be the more reasonable estimate for plaintiffs to respond and for complaint counsel to make the contemplated analysis.[43]

But it is not just the amount of time involved that troubles the Court. To be sure, it is unsettling to think that plaintiffs will not begin discovery until eight years after *Dkt. 8934* was commenced, and that only in 1982 will plaintiffs be able to begin an investigation that may need to stretch back 30 some years. And it does not obviate the Court's concern to be told by defendants that antitrust cases differ from other cases in the sense that document discovery from the companies is the basis of the suit, i. e., it is their policies under consideration and these policies are reflected in

---

41. Order Denying Motions of Certain Respondents for Issuance of Subpoenas Duces Tecum to the Federal Trade Commission, Exxon Corp., No. 8934 (F.T.C. November 1, 1978).

42. Hearing Transcript at 81.

43. Hearing Transcript at 41.

their own documents. This is not simply a document case.

In any event, what troubles the Court is that the Administrative Law Judge, according to the terms of his orders, has stopped plaintiffs' discovery *per se*. He is no longer making individual considerations and rulings; he is no longer "exercising his discretion to move this case along as expeditiously as is possible." [44] He has, in effect, decided to quit deciding, at least as regards plaintiffs' discovery requests, all of which must be channeled through him. This Court feels that due process precludes the Administrative Law Judge from making such a decision at this stage of the proceeding in *Dkt. 8934*.

The unfairness to plaintiffs is evident. The substantial passage of time since the issuance of the complaint means that potential, presently unknowable,[45] witnesses may transfer jobs, retire, or even die. Plaintiffs have offered an example of this last possibility. General George A. Lincoln, who served as head of the Office of Emergency Preparedness during the period 1969–1973 and who had responsibility for the government's Mandatory Oil Import Program restricting the importation of foreign crude oil into the United States, and thereby directly affecting the supply of crude oil for domestic refiners, died on May 24, 1975. His testimony on the detailed basis for such broad charges as that "since at least 1950, respondents, through common courses of action and agreements, have controlled access to the crude supply in the relevant geographic market," or that "the mandatory oil import programs supplemented and supported the maintenance of a non-competitive market structure in the relevant market," as claimed respectively in paragraph 114 and paragraph 263 of complaint counsel's Prediscovery Statement, would obviously have been material. Moreover, because complaint counsel may eventually rely on events occurring as far back as 1950, possibly thirty some years prior to plain-

tiffs' defensive discovery, it is evident that plaintiffs are justifiably concerned that the memory of witnesses may fade.

And there are potential witnesses other than government officials. Plaintiffs are charged with refusing to sell gasoline and other refined products to independent marketers. It can be assumed that some such marketers made complaints to the FTC. As things stand now in *Dkt. 8934*, plaintiffs do not know the identity or the specific complaints of these marketers, who may be disposing of documents daily, weekly, and yearly, documents that may support or undercut their story.

The above indicates a basic weakness in defendants' contention that little harm can come to plaintiffs because all of the important documents are in plaintiffs' possession. That simply cannot be true in *Dkt. 8934*. Plaintiffs will have relevant documents, third parties will have relevant documents, and the government itself will have relevant documents. It also does well to note that the government's record management programs result in the ongoing and regular destruction of documents. And, of course, documents will in the course of time simply be lost.

All this goes to say that there is a distinct danger that evidence needed by plaintiffs to adequately prepare themselves for administrative trial may well be gone when they are given the opportunity to discover it, and when they need it. This is tantamount to depriving plaintiffs of a fair opportunity to be heard. And because the Administrative Law Judge's order of November 1, 1978 denies discovery on a *per se* basis, it serves to further insure the denial of a fair hearing and must, therefore, be deemed offensive to due process.

Now this is not to say that the Administrative Law Judge cannot exercise his discretion, as he did in his prior discovery rulings. Due process leaves him free to continue to rule, if the situation warrants, that certain matters are "privileged," or

---

44. Hearing Transcript at 69.

45. The only witnesses ever identified were five economists whose depositions plaintiffs were refused.

that some requests are "unduly broad and burdensome," or that some requests simply do not request "relevant" information, and so on and so forth. But the Administrative Law Judge cannot simply turn his head to plaintiffs' requests. He must continue to hear them and, hopefully, if the parties and the Administrative Law Judge in *Dkt. 8934* continue to communicate, a way will evolve, by plaintiffs' continued refining of discovery requests, for the Administrative Law Judge "to move this case along as expeditiously as is possible" and, at the same time, to accommodate to plaintiffs' due process rights. One thing is certain, if the Administrative Law Judge simply refuses to listen, there can be no such mitigation of the danger of plaintiffs losing their rights to a fair hearing.

The Court is mindful that its decision today could be criticized for giving plaintiffs the opportunity to slow down *Dkt. 8934* by continued discovery requests. Such a view does not seem warranted, however, as it is *also* in plaintiffs' interests that the proceeding be moved along "as expeditiously as is possible." They will suffer the most from delay.

## IX. CONCLUSION

The Court is of the opinion that this case presents those "special circumstances" sufficient to overturn the deference courts ordinarily extend ongoing administrative proceedings. *Hunt v. Commodity Futures Trading Com'n.*, 591 F.2d 1234 (7th Cir. 1979). A reviewable matter is before the Court, whether an *Abbott* or an "exhaustion" analysis is used.

Using an *Abbott* approach, the primary factors to be considered are the fitness of the issues for judicial decision and the hard-

ship to the parties of refusing consideration. *Abbott, supra,* at 149–52. In the view of the Court, the matter before it is a strictly legal issue. There is no need for factual development beyond the record already made in *Dkt. 8934.* And there has been final agency action, in a "pragmatic" sense. The Administrative Law Judge subsequently reaffirmed his ruling cutting off discovery *per se* until complaint counsel completes the "second" wave of discovery,[46] and the Administrative Law Judge has refused to certify,[47] for review by the full Commission, plaintiffs' renewed discovery requests.[48] The Administrative Law Judge has clearly said what he had to say and has made up his mind. That decision is final pending direct review of the proceeding by the Commission, or review of a cease-and-desist order by a court of appeals, either of which certainly will not come about until the late 1980's, or the 1990's.

And this Court feels plaintiffs will suffer manifest hardship if judicial consideration is denied. As long as plaintiffs' discovery is at a *per se* standstill a clear and unnecessary risk exists that they will be denied a fair hearing because of lost evidence. And forcing plaintiffs to rely on direct Commission review of the entire proceeding or review by a court of appeals of a Commission cease-and-desist order would only *compound* that risk without serving any offsetting purpose.

The same results follow under an "exhaustion of administrative remedies" analysis. This case seems certain to fall under the "clear right" exception to the exhaustion rule. As it is the right to a fair hearing that is threatened, it would seem the right is "clear" enough to satisfy the requirements of the case law.[49] *See Rosen-*

---

**46.** Order Denying Joint Motion and Application of Certain Respondents for the Issuance of Subpoenas Duces Tecum Directed to Certain Government Entities, Exxon Corp., No. 8934 (F.T.C. December 11, 1978), Smith Aff. Exh. 59.

**47.** Interlocutory appeal is provided under 16 C.F.R. § 3.23(b).

**48.** Order Denying Requests of Respondents for Certification to the Commission of Order Deny-

ing Motions of Respondents for the Issuance of Subpoenas Duces Tecum to the Federal Trade Commission, Exxon Corp., No. 8934 (F.T.C., December 4, 1978), Smith Aff. Exh. 60.

**49.** Justice Fortas, who dissented in *Abbott,* even agreed that:

[T]here is residual judicial power in some extreme and limited situations to enjoin ad-

*thal & Co. v. Bagley*, 581 F.2d 1258, 1262 (7th Cir. 1978).

And this case would also seem to fit under the exception that applies where judicial review effectively would be foreclosed if a court does not intervene in the administrative proceeding. *Hunt, supra*, at 1237. On direct review, an appellate court would only proceed to consider whether a cease-and-desist order is supported by the evidence and a reasonable legal theory. 15 U.S.C. § 45(c); *Standard Oil Co. of Cal. v. F.T.C.*, 596 F.2d 1381, 1387 (9th Cir. 1979). As plaintiffs stress, a reviewing court a decade or so down the line will not be able to bring back evidence lost in the interim.

This Court can provide relief and its intervention will not intolerably disrupt FTC business, nor will it embrace the Court in the day-to-day conduct of *Dkt. 8934*. The Administrative Law Judge's orders cutting off discovery *per se* will simply be declared null and void. *Dkt. 8934* can then continue to be pursued by the Administrative Law Judge and the parties under the applicable statutes and rules, and also in a manner that acknowledges plaintiffs' constitutional rights, as set forth in this opinion.

Two cases stressed by defendants warrant mention here. In *Frey v. Commodity Exchange Authority*, 547 F.2d 46 (7th Cir. 1976), two registered brokers were charged in a complaint filed on July 6, 1972 by the Commodity Exchange Authority (CEA) before the Secretary of Agriculture with manipulating or attempting to manipulate the price of May 1971 wheat future contracts on the Chicago Board of Trade. Following a prehearing conference on April 25, 1973, CEA supplied the brokers with copies of exhibits which it intended to introduce and a list of witnesses which it intended to call at the hearing. The brokers then made a discovery request to the Administrative Law Judge for information to determine how much wheat had been available for delivery in May 1971, who controlled the wheat available for delivery, and the loca-

tion of the wheat. They argued that this information was necessary for them to prepare an adequate defense. The Administrative Law Judge denied the request, concluding that the Commodity Exchange Act, the applicable Rules of Practice, and the Administrative Procedure Act did not provide for discovery as a matter of right, and that parties to. quasi-judicial proceedings are not, entitled to discóvery as a matter of right. The Administrative Law Judge later ruled: "[I]f the evidence presented by [the CEA] at the hearing discloses the relevancy and materiality of [the brokers'] requested documents and reports they may be produced at [the] hearing . . .." 547 F.2d at 48. Before the hearing, an action was filed in the district court seeking declaratory and injunctive relief. Judge Perry ruled, *inter alia*, that the arbitrary denial of prehearing discovery violated due process and enjoined the proceeding until the brokers were given the opportunity to complete prehearing discovery.

Chief Judge Fairchild found this action "premature:"

> Obviously the administrative proceeding here had not progressed to a hearing. Who knows whether the Administrative Law Judge will find the evidence sufficient to sustain the charges, or whether the Secretary will agree with him if he does? If the final order were favorable to appellees, the present contentions would be moot. Once the hearing be completed, the devices suggested by the Administrative Law Judge may have proved adequate, or events at the hearing may demonstrate a need for the inquiry desired by appellees, and persuade the Administrative Law Judge to follow a procedure which will satisfy them. "Until administrative action has become final, no court is in a position to say that such action did or did not conform to applicable regulations."

> Assuming a final order, adverse to appellees, and that they continue to contend

ministrative actions even in the absence of specific statutory provisions where the agency has acted unconstitutionally . . .. 387 U.S. 176, 87 S.Ct. at 1531.

that denial of discovery prejudiced their defense, such denial may be reviewed along with review of the final action.

As is true in much litigation, correction of a procedural error on ultimate appeal will not avoid duplication of effort. But, "[m]ere litigation expense, even substantial and unrecoupable cost, does not constitute irreparable injury." *Id.* at 49 (Citations omitted).

Judge Fairchild also wrote that the "clear right" exhaustion exception was not applicable because:

For the purpose of this appeal, we conclude only that this statute [49 U.S.C. § 12], and the implementing regulations, do not confer upon such parties so clear a right to conduct discovery as to warrant judicial interference when discovery is denied by interlocutory order of the agency. *Id.* at 50 (Footnote omitted).

The decision of the Court today is not at odds with *Frey*. In that case, the Administrative Law Judge did not "decide not to decide"; on the contrary, he was exercising his inherent discretion by questioning the relevancy and materiality of the brokers' request for documents and reports. And he did not deny them discovery on a *per se* basis. If the documents appeared relevant and material at the hearing, they would be produced.

And there was no question of lost evidence in *Frey*. In *Dkt. 8934*, plaintiffs are six years beyond the complaint without significant discovery. And the fact that the ultimate conclusion of this massive proceeding could be a decade or more down the road gives substance to their fears of faded memories and dead witnesses. While one might contend that a court of appeals could set aside a cease-and-desist order because plaintiffs were not allowed adequate discovery, there is not a court of appeals in the land that could bring back lost evidence of the type in question here. It can be forcefully argued that given the sweeping conspiracy-type charges contained in the *Dkt. 8934* complaint, plaintiffs should not be told to be content to know- that they might be able to convince the Commission or a court

of appeals that the proceeding was conducted unfairly, and any decision should therefore be set aside. Plaintiffs should be entitled to try to get information now to clear themselves of any stigma or lingering suspicion created by *Dkt. 8934*. In this regard, the Commission or a court of appeals simply may not be able to help them on direct review.

Another case relied upon by defendants is *Sperry and Hutchinson v. F.T.C.*, 256 F.Supp. 136 (S.D.N.Y.1966). That case involved an FTC adjudicatory proceeding commenced by complaint filed November 15, 1965. The complaint alleged that S & H, alone and in combination with others, violated Section 5 of the FTC Act by limiting the issuance of its stamps to one for every ten cents paid to licensees and by suppressing trading stamp brokers and exchanges. After answer, S & H requested discovery that was described as being "tantamount to a complete disclosure of the Commission's files . . .." 256 F.Supp. at 144. The Commission denied this discovery request, on confidentiality grounds, and because "all documents which were necessary for the presentation of the defense could be supplied during the course of the normally scheduled pre-trial proceedings, or, if necessary, during the course of the trial itself." *Id.* at 139. During the subsequent pretrial proceedings, 400 documents were turned over to S & H; "[p]resumably those were among the items covered by [S & H's] original motion for discovery." *Id.*

S & H filed a district court action on May 24, 1966 and moved for a preliminary injunction on June 3, 1966 to restrain the administrative proceeding until *all* its discovery demands were satisfied. The administrative trial had been set to begin on June 15, 1966.

The trial court denied the motion for a preliminary injunction because: 1) there was no reason to delay the hearing until S & H got *all* the documents it wanted; 2) the Commission's decision to deny blanket discovery was a legitimate exercise of its discretion to preserve the confidentiality of

certain documents; 3) the record before the court was inadequate to rule on production on a document by document basis; 4) and, S & H had not established the inadequacy of direct review. *Id.* at 142–43. The court also rejected S & H's argument that the Administrative Procedure Act and the Commission's Rules guaranteed it "blanket" or "equal" discovery.. *Id.* at 143.

The resolution in *Sperry* was certainly proper under its particular set of facts. But here the Court is *not* faced with an administrative adjudication on the eve of trial or a proceeding in which a respondent has already received substantial discovery. And the Court's order today certainly does not mandate that plaintiffs be given *everything* they want *when they* ask for it. All the Court says is that the Administrative Law Judge must indeed hear their requests, exercise his discretion, and make his rulings, all as is contemplated under the applicable statutes and rules. The reason *Sperry* is correct is because discretion was in fact being exercised. The Commission denied some discovery on grounds of confidentiality. And so it may be, here, that the Administrative Law Judge's future rulings will be negative.

### ORDER AND DECLARATION

The Court, being duly advised in the premises, now ORDERS that plaintiffs' motion for summary judgment and defendants' motion for summary judgment are both GRANTED in part and DENIED in part, in the particulars made evident by the attached Memorandum of Decision, and pursuant to Rule 56, Federal Rules of Civil Procedure.

It is FURTHER ORDERED that the following orders of the Administrative Law Judge in *Dkt. 8934* are hereby declared null and void, to the extent they purport to deny plaintiffs' discovery on a *per se* basis until complaint counsel finishes the current substantive wave of discovery, for reasons set forth in the attached Memorandum of Decision:

1) Order Denying Motions of Certain Respondents for the Issuance of Subpoe-

nas Duces Tecum to the Federal Trade Commission (November 1, 1978), Smith Aff. Exh. 57.

2) Order Denying Joint Motion and Application of Certain Respondents for the Issuance of Subpoenas Duces Tecum Directed to Certain Government Entities (December 11, 1978), Smith Aff. Exh. 59.

The Clerk of the Court shall enter judgment in accordance with the above. The Court hereby advises the parties that it specifically retains jurisdiction to grant such other relief as may be necessary to effectuate the decision it makes today.